IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELISSA CALLAHAN, on behalf of  )
herself and all others similarly situated, )
                                           )
       Plaintiff,                        )
                                           )
       v.                                 )   No. 12 C 362
                                           )
CITY OF CHICAGO,                           )
                                           )
       Defendant.                         )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Melissa Callahan, representing a putative class of taxicab drivers, has sue the City of Chicago under 42 U.S.C. § 1983; the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206 and the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/4. In her five-count complaint, Callahan alleges claims of: (1) unconstitutional taking of property; (2) violation of procedural due process; (3) unjust enrichment; (4) violation of the FLSA; and (5) violation of the IMWL. All of Callahan's claims involve the City's taxicab regulations, which set the maximum rate that medallion owners may charge to lease a taxicab and the meter rate a driver must charge a passenger. The City has moved to dismiss Callahan's complaint. For the reasons stated below, the Court dismisses Callahan's constitutional claims and her unjust enrichment claim but declines to dismiss her FLSA and IMWL claims.

### Background

Callahan is a formerly full-time, now part-time cab driver in the City of Chicago.

Since January 1, 2010, she has been leasing her taxicab from a taxi medallion owner – an individual with a license to operate cabs in the City – who is affiliated with American United Taxi Affiliation, Inc.

The City sets the maximum rate that medallion owners may charge to lease a taxicab. It also sets the fare that Callahan or any other cab driver may collect. In addition, the City has in place regulations that govern various aspects of a cab driver's work. For instance, the City enforces a rule of "courtesy" between cab drivers and passengers, requires cab drivers to respond to assigned radio calls, determines the manner in which drivers may receive compensation, and prohibits cab drivers from refusing a fare to any destination irrespective of the hour. First Am. Compl. (FAC) ¶ 15. The City also requires cab drivers to dress in "proper attire," sets the maximum number of hours a cab driver may work, and provides that any violation of its rules may subject a cab driver to a fine or suspension of the cab driver's license. *Id.* ¶ 28.

Callahan alleges that by setting a high maximum medallion lease rate and a low taxi fare rate, the City has deprived her of a reasonable opportunity to make a fair wage. Specifically, Callahan alleges that while she was a full-time driver, she earned, on average, less than $8.25 an hour, the minimum legal wage in Illinois. She claims that, the City's actions in this regard amount to an unlawful taking of her property without just compensation, violate her constitutional right to procedural due process, and unjustly enrich the City to her detriment. Callahan also alleges that the control the City exerts over the manner in which she performs her work makes the City her employer under the FLSA and IMWL and that the City's failure to set rates that allow her to make minimum wage is therefore a violation of both statutes. The City has moved to dismiss the

complaint in its entirety for failure to state a claim.

## Discussion

On a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011). To avoid dismissal for failure to state a claim, a complaint must describe the claim sufficiently to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). In addition, a plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

**1. Unconstitutional taking**

Count 1 of the complaint states that the City's lease and meter rate regulations amount to an unconstitutional taking of Callahan's property without just compensation violative of the Fifth Amendment. Specifically, Callahan alleges that by setting a high maximum lease rate and low meter rate, the City has deprived her of a reasonable opportunity to earn a living and has thereby confiscated the reasonable value of her taxicab lease.

The Supreme Court has recognized two types of unconstitutional takings of property that can occur without physical occupation of the property at issue. The first takes place when a governmental rate regulation imposed upon a regulated industry is so low as to be "confiscatory." *Covington & Lexington Tpk. Rd. Co. v. Sandford*, 164 U.S. 578, 597 (1896). The second occurs when the government's regulation "goes too

3

far" in limiting the owner's use of his or her property. *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); see *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978).

Callahan argues that because the taxicab industry is a regulated industry, the Court must apply the standard used in confiscatory rate-regulation cases to evaluate the constitutionality of the City's rate regulation. In doing so, Callahan relies primarily on *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 302 (1989). In that case, a power company challenged a state law that precluded it from recovering the cost of power plants that were not in service even though the decision to build them was "reasonable and prudent" at the time of construction. *Id*. at 303. In analyzing whether the rates set by the state amounted to an unconstitutional taking, the Supreme Court explained that precedent had established that the Constitution "protects utilities from being limited to a charge for their property serving the public which is so unjust as to be confiscatory." *Id*. at 307 (internal citation and quotation marks omitted). The reason for this is that although such companies are operated by private investors, their assets are employed to serve the public interest. *Id*. The Court further stated that this "creates its own set of questions under the Takings Clause of the Fifth Amendment." *Id*. With the power company's "partly public, partly private status" in mind, the Court evaluated whether the rates set by the state were "confiscatory." *Id*.

The discussion in *Duquesne* makes clear that rates imposed on public utilities are evaluated under a separate standard because the involve a quasi-public industry that is highly capital-intensive. The standard used in rate-making cases has not been applied by the Supreme Court outside the public utility context. Even the rate-making

4

cases upon which Callahan relies deal with the constitutionality of government rate-setting for public utilities. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 790 (1968) (determining whether rates imposed on natural gas companies were constitutional); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) (establishing standard, in reviewing the Federal Power Commission's rate order on a natural gas company, for reviewing constitutionality of government regulation of public utility rates).

This Court therefore applies the regulatory takings jurisprudence relied upon by the City. Although regulatory takings jurisprudence originally emerged in the context of land-use restrictions, the Supreme Court has since applied the analysis in cases involving a variety of non-possessory regulatory restrictions. *See, e.g.*, *Penn Central*, 438 U.S. at 130 ("air rights"); *E. Enters. v. Apfel*, 524 U.S. 498, 522-37 (1998) (retiree benefits); *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 172 (1998) (interest on attorney trust accounts); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004-19 (1984) (pesticide formulas). This analysis requires courts to examine three factors: (1) the economic impact of the regulation of the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action. *Penn Central*, 438 U.S. at 124.

Considering these factors, Callahan has failed to state a viable takings claim at the most basic level. Although she alleges that she makes less than minimum wage because of the City's taxicab regulations, she does not allege that the City ever "took" anything from her. The requirement to evaluate the *amount* of economic impact, the *extent* of interference with an investment-backed expectation, and the *character* of

5

government action implies that there must first be some impact, interference, and government action. *Id.* But Callahan never alleges that the City changed or imposed new taxicab regulations at any point after she acquired a lease. Nor does she allege that the value of any lease she acquired diminished due to such a change. Instead, Callahan effectively acknowledges that she has entered into leases knowing full well that she will make less than minimum wage. Though this may well indicate that the City's regulations are unfair, it does not amount to a taking of property. Having alleged no diminution in the value of any of her leases, no change in the City's regulations, and no interference with any investment-backed expectation, Callahan's takings claim fails as a matter of law.

**2.    Procedural due process**

In Count 2 of her complaint, Callahan alleges a violation of her procedural due process rights. "To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) denial of due process.'" *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (quoting *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004)).

Callahan argues that because the City does not provide individualized hearings regarding taxicab regulations and in particular rate-making, it has deprived her of property without due process. The Court need not determine definitively whether Callahan has adequately alleged a deprivation of property, because it is clear that she cannot allege an absence of due process.

"When the legislature passes a law which affects a general class of persons,

6

those persons have all received procedural due process – the legislative process."
*Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan*, 797 F.2d 521, 527 (citation and internal quotation marks omitted). This is because the "prospective character [of legislation] enables the persons affected by it to adjust to it in advance." *LC&S, Inc. v. Warren County Area Plan Comm'n*, 244 F.3d 601, 602 (7th Cir. 2001). As the Supreme Court has stated:

> Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. . . . General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard.

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).

The lease and meter rate ordinances about which Callahan complains were enacted by a legislative body through the legislative process in a way that affects all persons engaged in the taxicab industry, including drivers, medallion owners, and passengers. *See* Municipal Code of Chicago, § 9-112-220(a)-(b) (requiring the Commissioner of Business Affairs and Consumer Protection to set maximum lease rates that medallion owners can charge at an amount that provides "lessees with an opportunity to earn a fair and reasonable income"); *id.* § 9-112-600(g) (allowing City Council to revise meter rates). In addition, although the Fourteenth Amendment's Due Process Clause does not require it, the City gives drivers like Callahan an opportunity to submit testimony when meter rates are set. *Id.* § 9-112-600(g) (requiring that the City hold hearings and consider testimony from any interested individual, licensee, or chauffeur before revising fare rates). Because of the ordinance's general applicability, the legislative process behind it satisfies the requirements of the Due Process Clause.

7

### 3. Unjust enrichment

Unjust enrichment is an equitable remedy available under state law. *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012). To state a claim for unjust enrichment, the plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment and that the retention of that benefit violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989).

Though Callahan has alleged that she suffered a detriment – that she does not make minimum wage – she has failed to allege that the City received a benefit. Callahan argues that the City has retained the benefit of "providing cheap common carrier service" and that if drivers like her did not provide taxicab services, "the City of Chicago would have to provide such common carrier services by persons directly employed by the City." FAC ¶¶ 64, 66. The City, however, has no legal responsibility under Illinois law or otherwise to provide common carrier services within its boundaries. The Metropolitan Transit Authority Act that created the Chicago Transit Authority (which is a separate entity from the City in any event) "invests no power and creates no duties or liabilities upon the City." *Marvin v. Chi. Transit Auth.*, 446 N.E.2d 1183, 1187, 113 Ill. App. 3d 172, 178 (1983). Callahan has therefore failed to state a claim for unjust enrichment.

### 4. FLSA

The FLSA requires "employers" to pay their "employees" a minimum hourly wage of currently $7.25 per hour. 29 U.S.C. § 206(a)(1). An employee is defined as "any individual employed by an employer," *id.* § 203(e)(1), and "employ" means to "suffer or

permit to work," *id.* § 203(g). Callahan claims that she is an employee of the City as the FLSA uses that term and that she is therefore entitled to the federal minimum wage for her work.

The terms "employer" and "employee" in the FLSA are read expansively to accomplish the statute's remedial purpose. *Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir. 1992); *Sec'y of Labor, U.S. Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). Courts engage in an "economic realities" test to determine whether a person is an employee within the meaning of the statute. *Lauritzen*, 835 F.2d at 1534. The test elucidates whether workers are "'dependent upon the business to which they render service,'" thereby making them employees under the statute. *Id.* (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)).

The Seventh Circuit lists six factors for courts to use as a guide in determining whether an employer- employee relationship exists. *Id.* at 1535. These factors are:

(1) the degree and nature of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending on his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his work;

(4) whether the service rendered requires special skill;

(5) whether the employment relationship is permanent or temporary; and

(6) the extent to which the service rendered is an "integral part" of the alleged employer's business.

*Id.* at 1534-35. Neither the presence nor the absence of any individual factor is

9

determinative. *Id*. at 1535. Rather, the existence of an employer-employee relationship depends "upon the circumstances of the whole activity." *Rutherford Food Corp.*, 331 U.S. at 730.

The City argues that Callahan has not alleged facts sufficient to establish an employment relationship under the FLSA. Specifically, the City argues that Callahan's allegations relating to the City's control over cab drivers are insufficient to demonstrate an employment relationship under the six-factor economic realities test. The Court disagrees.

Callahan alleges that she and other cab drivers were subjected to the City's control and were, on average, unable to earn minimum wage. She alleges that the City determines how she receives compensation – as well as how much – and what is or is not the most direct route to take when driving. She further alleges that the City prohibits her from refusing a fare to any destination, mandates that she wear "proper attire" while working, and requires her to respond to assigned radio calls. FAC ¶ 32. She also alleges that failure to comply with the City's rules can subject her to disciplinary action or payment of fines. In addition to the control the City exerts over cab drivers, Callahan alleges that she is unable to earn minimum wage, an allegation that fairly suggests that she has little or no opportunity for profit. Certain of the other factors listed above, however, tilt the other way.

The Court concludes that Callahan's allegations, considered as a whole and construed in favor as required at this stage of the proceedings, are sufficient to give rise to a plausible claim of an employment relationship between Callahan and the City. The question of whether Callahan can sustain that contention is an issue more appropriately

decided at summary judgment.  The Court declines to dismiss Callahan's FLSA claim.

**5.     IMWL**

The Court's determination that Callahan has sufficiently alleged an employment relationship also applies to her claim under to the IMWL.  See *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) (because the IMWL parallels the FLSA, the same analysis applies to both statutes).  The City argues, however, that even if Callahan has sufficiently alleged an employment relationship, she has failed to place the City on notice of the basis of her IMWL wage claim because she has not alleged any calculations or components that factored into her weekly wages.

Wage-and-hour claims do not require any more detailed factual allegations than whatever is required to give the defendant fair notice of the claim under *Bell Atlantic Corp. v. Twombly*.  See *Victoria v. Alex Car, Inc.*, 11 C 9204, 2012 WL 1068759, at *5 (N.D. Ill. Mar. 29, 2012).  In particular, there is no rule that requires a plaintiff to specifically allege in her complaint her rate of pay.  *Id.*  Callahan's allegation that she earned, "on average, less than the minimum wage of $8.25 an hour," FAC ¶ 8, is sufficient to put the City on fair notice of the basis of her IMWL claim.

**Conclusion**

For the foregoing reasons, the Court grants defendant's motion to dismiss [docket no. 39] with respect to Counts 1, 2, and 3 but denies the motion with respect to Counts 4 and 5.  The Court directs defendant to answer the remaining claims by no later than December 20, 2012.  The case is set for a status hearing on January 3, 2013 at 9:30 a.m. for the purpose of setting a discovery and pretrial schedule.  Counsel are directed to confer prior to the status hearing to attempt to agree on a schedule to

propose to the Court.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 29, 2012