MELISSA CALLAHAN, on behalf of herself
and all others similarly situated,

      Plaintiff,

      v.

CITY OF CHICAGO, a municipal
corporation,

      Defendant.

No. 12 CV 362

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Melissa Callahan is a taxicab driver in Chicago. She obtained her license to drive a taxicab in 2007, and drove full time between January 2009 and August 2011. Callahan asserts that, during that period, she was unable to earn the minimum wage as defined by the Fair Labor Standards Act ($7.25 per hour) or by the Illinois Minimum Wage Law ($8.25 per hour). In 2012, Callahan sued the City of Chicago, claiming: (1) that the City was her employer under these statutes; and (2) that it violated those laws by failing to pay her the required minimum wages. The City moves for summary judgment on Counts IV and V of Callahan's amended complaint. Callahan cross-moves for summary judgment on the same counts.

The City of Chicago closely regulates the taxicab industry. It licenses both the owners and drivers of cabs, sets maximum rates charged to consumers, and sets standards for drivers' conduct and appearance, among other things. The City also benefits from taxis working within its borders. The City requires much from those

who would operate taxicabs, but the City has not gone so far as to employ the individual lessees who drive them—the City regulates, but it does not provide the business to which cabdrivers render service. As a result, the City was not Callahan's employer under the FLSA or IMWL, and is not liable to her for any wages.

To prevail on a minimum-wage claim under the FLSA or IMWL, a plaintiff must prove not only that the defendant was her employer, but that she was not in fact paid the minimum wage. On this latter front, Callahan has not produced admissible evidence from which a jury could reasonably infer much, if anything, about her hourly income and whether it fell below the applicable minimum. Her own calculations are premised on inadmissible evidence and speculation. Consequently, Callahan cannot defeat the City's motion for summary judgment.

For the reasons discussed below, the City's motion is granted, and Callahan's motion is denied.

## I.  Legal Standard

Summary judgment may be granted where "there is no genuine issue of material fact and . . . the movant is entitled to judgment as a matter of law." *Hussey v. Milwaukee Cnty.*, 740 F.3d 1139, 1142 (7th Cir. 2014) (quoting *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). In reviewing a summary-judgment motion or a cross-motion for summary judgment, a court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)).

## II.    Facts

### A.    Licensing and Regulation of Taxicabs

The Department of Business Affairs and Consumer Protection is an executive department of the City of Chicago. *See* Municipal Code of Chicago § 2-25-020. Among the powers and responsibilities of the department is to review and process applications for city business licenses. *See id.* § 2-25-050(b). Pursuant to this power, the department issues on behalf of the City approximately 49 types of business licenses, including licenses concerning public-passenger vehicles such as taxicabs. *See* [122] at 2 ¶ 5.[1]

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets; referenced page numbers are from the CM/ECF header placed at the top of filings. The facts related in this opinion are taken largely from relevant statutes and regulations, as well as from the parties' Local Rule 56.1 statements of uncontested facts (and replies or responses thereto), which set forth the parties' positions concerning the facts material to the motions for summary judgment. Some of the latter materials (and their exhibits or appendices) were filed under seal. To the extent this opinion discusses any content previously filed under seal, the party that originally filed that document must file on the court's docket a public version of the same. The public version should leave visible any content referenced below. *See City of Greenville, Ill. v. Syngenta Crop Protection, LLC*, 764 F.3d 695, 697 (7th Cir. 2014).

Before a taxicab may be operated in Chicago, the taxicab generally must be licensed by the City through the department. *See* MCC § 9-112-020.[2] A taxicab medallion is a metal plate, provided by the City, to be affixed to the outside of a cab as a physical representation of a license to operate that vehicle as a taxicab. *See* [122] at 8–9. ¶ 24; *see also* MCC § 9-112-010. Medallion licensees, or medallion holders, often form medallion-holder associations, or "taxicab affiliations." *See* [122] at 8–9. ¶ 24. Yellow Cab and American United, for example, are well-known taxicab affiliations. *See id.* "Affiliates" are the members of a taxicab affiliation. *See id.*

Licensed taxicabs must have certain features and equipment. *See, e.g.*, MCC § 9-112-140 (required safety features); *id.* § 9-112-510 (required taximeter equipment). They are also subject to inspection at the direction of the department commissioner. *See id.* § 9-112-050. Failure to follow the rules and regulations governing medallion holders may subject those owners to fines, or to suspension or revocation of their taxicab license(s). *See id.* § 9-112-370(b); *see also* Taxicab Medallion License Holder Rules and Regulations (July 1, 2012) ("2012 Medallion Holder Rules"), [121-29] at 27–28 (Rule TX17.02); Rules and Regulations for Taxicab Medallion License Holders (May 1, 2008) ("2008 Medallion Holder Rules"), [121-22] at 51 (Rule 15.02).

---

[2] A taxicab licensed by another jurisdiction may be operated in Chicago, but only under limited circumstances (such as when dropping off a passenger whose trip originated outside of the City). *See* MCC § 9-112-020(d). Such taxicabs can accept passengers in the City only if those passengers are traveling to the jurisdiction where the cab is licensed, and if the trip was arranged in advance. *See id.* 9-112-020(c).

From time to time, the City of Chicago holds auctions for taxicab medallions. *See* [142] at 7 ¶ 22; *see also* MCC § 9-112-480. The average price of a medallion in 2007 was $63,781. *See* [142] at 7 ¶ 21. As of 2013, the minimum bid at auction was $360,000. *See id.* ¶ 22.

Medallion holders may transfer their medallions to others. *See* MCC § 9-112-430(d). In 2013, the average market value for a medallion transfer was more than $348,000. *See* [142] at 7 ¶ 20. When a medallion is transferred, the transferee must pay to the City a transfer fee, which ranges from 5 to 25 percent of the transfer price depending on certain factors (such as when the transferor acquired the medallion). *See* MCC § 9-112-430(g). Medallion owners who instead choose to keep their medallions and renew those taxicab licenses must pay a renewal fee. *See id.* § 9-112-150; *see also* 2012 Medallion Holder Rules, [121-28] at 7–8 (Rule TX2.04(d)); 2008 Medallion Holder Rules, [121-22] at 38 (Rule 9.04(3)). Newly-issued medallions are subject to a licensing fee, as well. *See* MCC § 9-112-150.

## B. Licensing and Regulation of Public Chauffeurs

Chicago taxicabs may be operated only by licensed chauffeurs. *See* MCC §§ 9-104-020, 9-112-260. To obtain a public chauffeur's license in Chicago, the applicant must satisfy certain criteria, including: (1) they must have a valid Illinois State driver's license; (2) they must be at least 21 years old; (3) they must be able to speak, read, and write English; (4) they cannot have certain medical conditions, such as epilepsy; and (5) they must have successfully completed a mandatory training course. *See id.* § 9-104-030(2). The commissioner is tasked with providing

(or "caus[ing] to be offered") such training courses, which may be done in "contract with the city colleges." *Id.* § 9-104-030(7).

A licensed public chauffeur is not obligated to use her license, and so may take extended absences from driving if she wishes. *See* [148] at 2 ¶ 4; *id.* at 8 ¶ 15. However, to the extent a chauffeur does elect to use her license, she is subject to various rules and regulations governing her conduct. Regulations concerning a public chauffeur's conduct are set forth in the City's Municipal Code, *see* MCC § 9-104-060 *et seq.*, and in a series of rules promulgated by the department, *see* Public Chauffeurs Rules and Regulations (as amended December 3, 2012), [121-14]. For example, public chauffeurs must operate their vehicles safely and be "courteous to passengers . . . and other drivers," *id.* at 20 (Rules CH5.08(a), (d)). They must also remain "clean and neat in their appearance at all times," *id.* at 22 (Rule CH5.09). Appearing clean and neat includes wearing the proper attire—a shirt or blouse with sleeves, *see id.* If a passenger has left personal belongings in the taxicab, the driver must bring the items within 24 hours to the lost-and-found office of her taxicab affiliation, or to the nearest police department if the driver is operating an unaffiliated cab. *See id.* (Rule CH5.10).

Chauffeurs' driving hours are also regulated to a certain extent. For example, current regulations prevent drivers from operating a taxicab for more than 12 consecutive hours in a 24-hour period. *See* [148] at 7 ¶ 13 (citing MCC § 9-112-250).[3]

---

[3] This regulation was not in place between January 2009 and August 2011, *see* [148] at 7 ¶ 13, the time period to which plaintiff's alleged damages are limited, *see* [122] at 1 ¶ 1.

While in service, chauffeurs cannot leave their cabs unattended. *See* [121-14] at 20 (Rule CH5.06).

The rules and regulations also address how a chauffeur may accept passengers, drive passengers to their destinations, and collect fares. For example, if the driver's taxicab is "for hire,"[4] she must agree to transport "any person . . . to any destination" unless certain exceptions apply (*e.g.*, the driver is on her way to pick up a passenger who phoned in a taxicab request). *Id.* at 18 (Rule CH5.02(a)). If the request for cab service came directly to the driver through a radio-dispatch call made by her taxicab affiliation, she must respond to that call. *See id.* at 19 (Rule CH5.03). Drivers who have leased their cabs from an affiliation also have an affirmative duty to respond to dispatch calls requesting cab service for passengers in "underserved areas"[5] at least once during a lease of 24 hours or fewer (or at least 7 times during a weekly lease). *See id.* at 25 (Rule CH6.01(a)). If the chauffeur would like to attempt to find passengers using a cab stand (or in the vicinity of one), she must follow certain rules—*e.g.*, she must go to the back end of the line if using the stand. *See id.* at 17 (Rule CH5.01).

---

[4] A chauffeur may designate their vehicle as "not for hire" when: (1) the driver is responding to radio or telephone orders; (2) the vehicle or fare meter is in disrepair or is out of service; (3) the driver is returning the vehicle to its garage; or (4) the driver is on her way to a meal or a break for "personal necessity" (*i.e.*, bathroom break). *See* [121-14] at 18 (Rule CH5.02(c)).

[5] Underserved areas are, with certain exceptions, defined as "all areas within the corporate limits of the city of Chicago which are located either north of Devon Avenue; west of Ashland Avenue between Devon Avenue and Grand Avenue; west of Halsted Street between Grand Avenue and Roosevelt Road; or south of Roosevelt Road." Public Chauffeurs Rules and Regulations: Definitions, [121-14] at 6.

Once the driver has accepted a passenger, she must take the passenger to their destination "by the most direct route." *Id.* at 19–20 (Rule CH5.04(c)); *see also id.* at 33 (Rule CH11.02). Accordingly, drivers must know—or must have reference materials "immediately available" in order to determine—what that route is. *Id.* at 19 (Rule CH5.04(b)).

Maximum fare rates are prescribed by the City, and are set forth in the Municipal Code. *See* MCC § 9-112-600(a). Drivers cannot charge more than the maximum permitted fare rate.[6] *See id.* § 9-112-600(b); *see also* [121-14] at 34 (Rule CH11.05). Passengers may pay their fares using any form of legal tender, including credit cards. *See* [121-14] at 34 (Rule CH11.06(a)).

---

[6] The Municipal Code describes fare rates as follows:

|  |  |
|---|---|
| For the first 1/9 mile or fraction thereof: | $3.25 |
| Forty-five cents of this initial mileage rate for the first ten taxicab fares which a driver transports per day is hereby designated for payment of workers' compensation insurance. |  |
| For each additional 1/9 mile or fraction thereof: | $0.20 |
| For each 36 seconds of time elapsed: | $0.20 |
| For the first additional passenger over the age of 12 years and under the age of 65 years: | $1.00 |
| For each additional passenger, after the first additional passenger, over the age of 12 and under the age of 65 years: | $0.50 |
| Vomit clean-up fee: | $50.00 |

MCC § 9-112-600(a).

Members of the public may alert the City to potential violations of these rules and regulations by dialing "311." *See* [142] at 4–5 ¶ 15.[7] Rule violations can subject public chauffeurs to various penalties, including fines, or suspension or revocation of their chauffeur's license. *See, e.g.*, MCC §§ 9-104-040(a), 9-104-140; *see also* [121-14] at 46 (Rule CH16.02) ("first offenses" may subject a driver to fines between $75 and $750, while "repeated" or "aggravated" offenses may subject a driver to fines between $200 and $750). Before any such penalty may be imposed, however, the driver must be notified, and an administrative hearing provided upon written request. *See* MCC § 9-104-040(c).

---

[7] Plaintiff contends that the City "solicits" such complaints (or compliments) by posting signage in taxicabs "requesting" the public to provide comments or criticisms about a driver's performance. *See* [142] at 4 ¶ 15. The City denies that it solicits or requests any such comments, though it admits that members of the public may elect to provide such information "through the City's '311' service." *Id.* at 4–5 ¶ 15. The City also denies that it posts any signage in taxicabs requesting passengers to comment on driver performance, as the exhibits relied on by plaintiff purportedly do not support this statement. *See id.*

The City is correct that the references on which plaintiff relies do not suggest that the City posts any comment-or-complaint signs in taxicabs. Rule TX5.05 of the 2012 Medallion Holder Rules does require that the words, "Call 311 for Compliments or Complaints" be printed on all taxi-meter receipts. *See* [121-28] at 24. But receipts—required to be available only "upon request of a passenger," [121-14] at 34 (Rule CH11.07)—are different from posted signs that are visible to all passengers, as are required signs communicating fare and safety-inspection information.

A print-out from the City's website explains that individuals may use the website to report problems with taxicabs. *See* [121-6]. The print-out does not address signage in the cabs, themselves. A video displayed on the department website, *see* [142] at 4 ¶ 15 (citing http://www.cityofchicago.org/city/en/depts/bacp/provdrs/vehic.html), describes "311" placards to be placed not *in* taxicabs, but on them—*i.e.*, as bumper stickers. The video states that, as of "June 30" (year unspecified), the department will require all taxicabs to have on its bumper a sticker reading, "How's My Driving? Compliments or Concerns Call 311[.] Report Taxi Number." The video ends by telling the viewer to "please call us. Tell us what your experience is like."

The difference between soliciting comments and providing an opportunity to comment is immaterial at this stage—what is undisputed is that the City has a role in receiving information about cab-driver performance.

Licensed taxicab drivers are also subject to special transportation-related taxes. The Metropolitan Pier & Exposition Authority Airport Departure Tax is imposed on cab drivers and other drivers licensed by the City to provide ground transportation for hire. *See* [142] at 13 ¶ 35; [121-7] at 4. Taxicab drivers who pick up passengers from either of Chicago's major airports (O'Hare and Midway) must buy corresponding MPEA "tax stamps." [122] at 10 ¶ 31.

### C.    Administrative Fees, Lease Rates, and Income

To obtain a public chauffeur's license, an applicant must pay a licensing fee. *See* [121-14] at 10 (RuleCH1.15); MCC § 9-104-070 ($15.00 for an "original" chauffeur's license). First-time applicants must also complete a mandatory training course, as described above, and may be required to pay tuition for that course, *see* [122] at 1 ¶ 2. Licenses may be renewed for an additional fee ($8.00 per renewal application). *See* MCC § 9-104-070.

The City does not own any taxicabs. *See* [122] at 9 ¶ 26. If a licensed public chauffeur wants to drive a taxicab but does not herself own a licensed cab (*i.e.*, she is not a medallion holder), she may lease the cab from a taxicab affiliate; plaintiff here is such a lessee. *See id.* ¶ 25. The City has established a schedule of maximum lease rates based on the taxicab's fuel efficiency. *See* MCC § 9-112-230.[8]

Taxicab drivers, including lessee-drivers such as plaintiff, earn money from passengers who pay the drivers for their taxicab services. *See* [122] at 9–10 ¶ 28. To

---

[8] For example, the maximum daily lease rate for a 12-hour shift is $74 for a taxicab whose fuel efficiency is greater than or equal to 36 miles per gallon ("Tier 1"), while the maximum lease rate for a vehicle achieving only 25 to 35 miles per gallon ("Tier 2") is $69. *See* MCC § 9-112-230(a).

the extent that this income derives from metered fares, the maximum fare rates are set by the City, *see* MCC § 9-112-600, as described above. A portion of a cab driver's income may also come from tips. *See* [122] at 10 ¶ 30. The City does not control how much a given passenger may tip, *see id.*, and indeed some drivers receive larger tips as a result of specific actions that they take. Some drivers, for example, receive larger tips because they: (1) advertise their taxicab services using business cards or online social media; (2) market themselves in a "unique" way, such as by singing to their passengers or by decorating their cabs; (3) provide entertainment or other amenities to their passengers, such as movies or television programming, reading materials, or internet access; or (4) connect with their passengers more quickly using mobile-phone technologies. *See* [148] at 8–9 ¶¶ 16–17.

Some taxicab drivers may also try to improve their income by avoiding areas where it is more difficult to connect with passengers, or by avoiding areas where the passengers, as the driver has learned, generally provide smaller tips, *see id.* at 12 ¶ 25. (Conversely, some drivers, including plaintiff, will keep track of large events such as sports games or theatre productions, and will try to be at those locations when the events are letting out. *See* [122] at 12 ¶ 37.) And some drivers will not pick up passengers from airports, because they do not find airport trips to be a good investment of their time. *See* [148] at 7 ¶ 13.

Drivers may also attempt to improve their earnings not by increasing their income, but by decreasing their expenses or other losses. For example, taxicab drivers may comparison-shop for gas prices and attempt to minimize the amount of

gas they use by decreasing their use of air conditioning, or by accelerating more smoothly. Plaintiff takes this approach. *See* [122] at 16 ¶ 48. Driving carefully may also lower a driver's expenses through avoiding accidents. *See id.* ¶ 49.

### D. Melissa Callahan's Taxicab Driving

#### 1. Callahan's Licensure and Driving History

Melissa Callahan first became a Chicago taxicab driver in 2007, when she obtained her public chauffeur's license. *See* [122] at 1 ¶ 1; [142] at 1–2 ¶ 1. Before she obtained her public chauffeur's license, Callahan completed a two-week training course at Harold Washington College; the course addressed geography and the rules and regulations for driving a taxicab in Chicago, among other things. *See* [122] at 1 ¶ 2. She paid approximately $275 in tuition for this course. *See id.* Callahan did not interview with the City to become a taxicab driver. *See id.* at 2 ¶ 3. She was never told by the City that she had been hired to perform work for the City. *See id.* The City did not ask Callahan to complete any tax-related forms, such as a W-4, as a condition for receiving her chauffeur's license. *See id.* ¶ 4.

Callahan used her chauffeur's license to drive taxicabs beginning in 2007, and she was a full-time cab driver between January 2009 and August 2011. *See* [142] at 1–2 ¶¶ 1, 5. During that period, she would lease a taxicab from a cab owner of her choice. *See id.* at 2–3 ¶ 6; [122] at 14 ¶ 41; [141] at 2 ¶ 2. The leases that Callahan entered with the cab owner were typically daily leases of 12 or 24 hours each. *See* [141] at 2 ¶ 3. The City of Chicago did not provide Callahan with any taxicabs to drive. *See* [122] at 9 ¶ 27.

While leasing taxicabs, Callahan purchased gasoline to use in the cabs. *See id.* at 10 ¶ 31. She also bought a guidebook that had a list of streets, spent money on car washes for the cabs, and purchased MPEA tax stamps. *See id.* The City of Chicago did not provide Callahan with gas for the taxis she leased, or with any other materials necessary to drive a taxicab. *See id.* at 8–9, ¶¶ 23, 27. Nor did the City provide Callahan with any passengers for her cab. *See id.* at 9 ¶ 27.

### 2.    *Control Over Callahan's Taxicab Leases and Driving*

Callahan selected the taxicab affiliations from which she leased her cabs; the City did not dictate her choice. *See id.* at 14 ¶ 41. When driving a leased taxicab, Callahan would decide where to go to look for passengers in need of taxicab services—unless, that is, she received a radio-dispatch call from the affiliate from whom she had leased her cab. *See id.* at 4 ¶ 10. Similarly, Callahan would decide whether to drive to a city airport in search of potential fares. *See id.* ¶ 11. It was also Callahan's choice whether to use (or not) a particular taxicab stand. *See id.* ¶ 12.

The City generally required Callahan to take the most direct route to a given destination, but did not otherwise dictate the specific routes that she took. *See id.* at 6 ¶ 18. Callahan set her own driving hours and decided when she would take breaks, though the City now limits (to twelve) the number of consecutive hours that a taxicab driver may drive. *See id.* at 4–5 ¶¶ 9, 17; *see also* MCC § 9-112-250(a).[9] Callahan also decided if and when to take vacations from driving a taxicab, and did

[9] As noted above, this regulation was not in place when Callahan was a full-time taxicab driver (*i.e.*, between January 2009 and August 2011).

not inform the City (or seek its approval) when taking such vacations. *See* [122] at 5 ¶ 15. Nor did she inform the City of any sick days she took from driving. *See id.* ¶ 16. She wore her own clothing while driving a cab (typically a pair of pants and a shirt); the City did not inspect her chosen attire or personal appearance. *See id.* ¶¶ 13–14.

### 3. *Callahan's Earnings, January 2009 to August 2011*

Callahan did not keep complete records of her income and expenses from taxicab driving between January 2009 and August 2011—indeed, her recordkeeping was quite poor. She did recall that she had earned only enough money to cover her total expenses. *See id.* at 17 ¶ 53; [141] at 4 ¶ 7. For the purposes of this litigation, Callahan therefore estimated her earnings from driving a taxicab in 2009, 2010, and 2011, by estimating: (1) her household expenses (rent, utilities, and the like); and (2) taxi-related expenses (money spent on gas and cab leases). *See id.* In estimating her personal or household expenses, Callahan relied on some (unidentified) bills and receipts that she had kept; she had not retained all of those records, however, so she used rough estimates to fill in the gaps. *See* [122] at 17–18, ¶¶ 53–57. She estimated her taxi-related expenses based on her personal knowledge and experience as a taxicab driver. *See* Declaration of Melissa Callahan, [121-26] at 4 ¶ 20. Using this approach, Callahan estimated that she earned the following from driving a taxicab full time: $2,210 in 2009; $12,777 in 2010; and $9,414 in 2011 (January through August). *See* [122] at 17–18 ¶¶ 54, 56–57.

In 2013, Callahan filed amended tax returns for the years 2009, 2010, and 2011. *See* [95] at 14 ¶ 59; [122] at 18 ¶ 59.[10] Callahan did not provide her return-preparer with any documents concerning her income and expenses during those years; she calculated these figures herself . *See* [95] at 14–16, ¶¶ 60, 62, 64; [122] at 18–19, ¶¶ 60, 62, 64. She calculated those figures by looking at her household expenses (rent, utilities, etc.) and estimating her tax-related expenses (gas, cab leases), and then assuming that her income was approximately the same as her total expenses. *See* [141] at 5 ¶ 9. In her amended tax returns, Callahan reported having earned the following profits from taxicab driving: $2,158 in 2009; $12,832 in 2010; and $9,414 in 2011. *See* [96-3] at 7; [96-4] at 7; [96-5] at 6.

Callahan also made some handwritten notes of what she spent on taxicab expenses (leases, gas), and what she earned from taxi driving, for seven months in 2009 (February, May, June, July, August, November, and December) and two months in 2010 (January and February). *See* [141] at 2 ¶ 4. In addition, Callahan obtained some credit-card payment reports from 2012, which purported to show some earnings that Callahan had made as a taxicab driver in that year. *See id.* at 5 ¶ 8.

Between January 2009 and August 2011, Callahan did not keep any records of the number of hours she drove a taxicab for hire. *See* [122] at 21 ¶ 73. Nor did she keep a calendar or schedule of her driving. *See id.* Callahan did retain copies of

---

[10] In her original tax return for 2009, Callahan did not report any income from driving a taxicab. *See* [95] at 13–14 ¶ 58; [122] at 18 ¶ 58. She did report taxi-related income in her originally-filed 2010 and 2011 returns. *See* [96-6] at 4 (declaring $16,133 in profits in 2010); [96-7] at 4 ($3,574 in 2011).

nearly all of the taxicab lease agreements she entered in 2010 and 2011, however, and asserts that she worked all, or nearly all, of the hours of each lease. *See* [141] at 3 ¶ 5.

E. **Procedural History**

In January 2012, Callahan sued the City of Chicago under the Fair Labor Standards Act. *See* [1]. Callahan subsequently amended her suit to be a putative class action, alleging that the City was her employer within the meaning of the FLSA, and that the City is liable under the Act because she did not earn the required minimum wage ($7.25 per hour), *see* [33] at 13–14 (Count V). Callahan also asserted a similar claim against the City under the Illinois Minimum Wage Law (Count IV), which requires that employees be paid a minimum of $8.25 per hour. *See id.* at 12–13. Three other counts were dismissed from the case and are not at issue here. *See* [39]. The City and Callahan both move for summary judgment on Counts IV and V of the amended complaint. [90]; [119].

III. **Analysis**

A. **Fair Labor Standards Act (Count V)**

The FLSA was enacted in 1938 "to protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). The goal was to ensure "a fair day's pay for a fair day's work." *Id.* (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942)) (internal brackets and quotation marks omitted); *cf. Vanskike v. Peters*, 974 F.2d 806, 810 (7th Cir. 1992). Not all workers benefit from the Act's

protections, however. These protections are afforded only to "employees." *See* 29 U.S.C. § 206(a) ("Every employer shall pay to each of his employees . . . wages at the [specified] rates . . . ."). The threshold question, then, is whether Melissa Callahan is an "employee" of the City of Chicago within the meaning of the FLSA. The statute itself provides little guidance, defining "employee" in a circular fashion. *See id.* § 203(e)(1) ("[T]he term 'employee' means any individual employed by an employer.").[11] The Act defines "employ" as "to suffer or permit to work." *Id.* § 203(g).

Callahan did not interview to become a formal employee of the City of Chicago; she was never told by the City that she had been made, or would be made, an employee; and the City never provided her with an employee handbook, manual, or other personnel policy. *See* [122] at 2 ¶¶ 3–4. She was not, in other words, what one typically considers to be an "employee" in the traditional (or common-law) sense. *See Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 952 (7th Cir. 2014) (quoting *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449–50 (2003)). But, as Callahan correctly points out, the FLSA uses a much broader definition of "employee" than is found at common law. *See Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 565 (7th Cir. 2009); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) ("[The FLSA] stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."). Indeed, the Act's definition of "employ" is "the broadest definition . . . ever included in any one

---

[11] "Employer" may include a public agency, *see* 29 U.S.C. § 203(d), which may be a political subdivision of the state (as here), *see id.* § 203(x).

act," *Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 408 (7th Cir. 2007) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945)).

The City sets many aspects of a cab driver's job performance. Callahan must possess a public chauffeur's license and must drive a properly licensed cab. *See* MCC §§ 9-112-020, 9-104-020. The City quite literally "permits" Callahan to work as a taxicab driver. But the statute, though broad, is not limitless. *See Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985); *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). Once the appropriate boundaries have been drawn, the City-Callahan relationship falls outside of the Act.

### 1.    *The City's Involvement in Taxicab Operation*

The statute provides that Callahan is the City's employee if the City "suffer[s] or permit[s her] to work." 29 U.S.C. § 203(g). Not just any work qualifies, however. Individuals are "working" within the meaning of the Act—and so are entitled to be paid for any time spent so "working"—when they are performing activities "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer *and his business.*" 29 C.F.R. § 785.7 (quoting *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944), *overruled on other grounds and superseded on other grounds by statute as stated in IBP, Inc. v. Alvarez*, 546 U.S. 21, 25–28 (2005)) (emphasis added); *see also Musch v. Domtar Industries, Inc.*, 587 F.3d 857, 859 (7th Cir. 2009) (citing *Jonites v. Exelon Corp.*, 522 F.3d 721, 726 (7th Cir. 2008)); *Sehie v. City of Aurora*, 432 F.3d

749, 751 (7th Cir. 2005) (citing 29 C.F.R. § 785.7).[12] Put another way, "employees [under the FLSA] are those who as a matter of economic reality are dependent upon the business to which they render service." *Sec'y of Labor, U.S. Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (1987) (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 299 (5th Cir. 1975)). Thus, the critical question here is whether the "business" to which Callahan renders service is, in fact, the City's business.

Callahan is a taxicab driver; the service she provides is therefore the transportation of passengers by taxicab, and the City controls to quite a significant extent the operation of taxicabs in Chicago. Licensure, equipment, and other requirements for taxicabs are set by the City and determine the physical environment in which cab drivers work. The City also regulates taxi drivers directly through licensure, eligibility, and conduct requirements that are specific to them. In addition, taxicab drivers must follow certain rules regarding how they obtain and transport passengers. But controlling or regulating how taxicabs are operated is not the same as providing, or undertaking to provide, transportation by taxicab. The City does not perform the latter role.

The City does not provide the taxicabs themselves—and so does not provide transportation by taxicab directly—because it does not own any, *see* [122] at 9 ¶ 26. The City provides only the licenses (*i.e.*, medallions) that allow private vehicle

---

[12] *Sehie* states that the general rule is that an employee's work must be "necessarily and primarily for the benefit of the employer *or* his business." 432 F.3d at 751 (quoting 29 C.F.R. § 785.7) (emphasis added). The quoted federal regulation, however, uses the conjunctive "*and* his business." 29 C.F.R. § 785.7 (quoting *Tennessee Coal*, 321 U.S. at 598) (emphasis added).

owners to operate their vehicles as taxicabs. *See* MCC § 9-112-010; [122] at 8–9 ¶ 24. Nor is there any evidence that the City provides taxicab transportation indirectly—*i.e.*, by requiring or mandating that licensed taxicabs actually be used. Indeed, the evidence is to the contrary: taxicabs in Chicago may be driven lawfully only by licensed public chauffeurs, *see* MCC §§ 9-104-020, 9-112-260, and there is no requirement that public chauffeurs actually use their licenses, *see* [148] at 2 ¶ 4. This is a critical point. The City can, as Callahan asserts, effectively limit the maximum number of in-service taxicabs available to passengers by capping or otherwise controlling the number of medallions in circulation at any given time. But the City does not go so far as to set a minimum number of cabs that must be driven for hire. The City makes no guarantee to would-be passengers that taxicab services will be available. The City therefore does not provide transportation by taxicab, even indirectly.

Callahan offers several reasons why, in her estimation, the City is "in the taxi business." Callahan posits that the City is in the taxicab business because: (1) the City profits from the sale of taxi medallions, medallion-transfer fees, and the collection of related taxes; (2) taxicab service is an essential part of transportation in the City; (3) the City owes medallion holders a reasonable return on their investment in medallions; and (4) the City acts in the interest of medallion owners, who used to supervise and control taxicab drivers. None of these arguments is persuasive.

a.    <u>Taxi-Related Revenues</u>

The City allegedly "profits" from taxi services in several ways. To begin, says Callahan, the City collects millions of dollars from medallion auctions—such as in 2013, for example, when the opening bid (for each of 50 available medallions) was $360,000. *See id.* at 30. The City also collects money when one medallion owner transfers his medallion to another, since the transferee must pay the City a fee; this fee ranges from 5 to 25 percent of the sale or transfer price. *See id.*; *see also* MCC § 9-112-430(g). Finally, notes Callahan, the City collects taxes related to the provision of taxicab services: a monthly ground-transportation tax, *see* [120] at 31; *see also* MCC § 3-46-030(B)(1)(a)(i) (requiring the payment of $78.00 per month); and airport-related (MPEA) taxes, imposed on taxicab drivers when they pick up passengers from Chicago-area airports, *see* [120] at 31; [122] at 10 ¶ 31.

What Callahan describes, however, are not "profits" from a business of providing transportation by taxicab, but revenues derived from regulating the taxicab industry. Taxicab medallions, in effect, are permits that allow the permittee to use taxicabs for hire on city property. The City charges a fee for this privilege, and thus collects revenue from those who provide transportation by taxicab. But this does not suggest that the City itself provides (or guarantees provision of) those services. The power to tax may be the power to destroy, but the collection of taxes, fees, or revenue by a governmental entity does not make the regulated industry the business of that government. Nor does it cause the regulated person to render their services to the government.

b.    <u>Importance to Transportation in Chicago</u>

Callahan also argues that the City is in the business of providing taxicab services because these services are essential to transportation in the City as a whole. *See* [120] at 32–33. In support of this argument, Callahan offers as expert testimony the opinion of Dr. Robert Ginsburg. *See id.* at 32. Dr. Ginsburg earned his undergraduate and doctoral degrees in Chemistry, and from June 2011 to October 2013 served as Administrative Director of the Department of Transportation and Highways for Cook County, Illinois. *See* [121-13] at 4, 7. Dr. Ginsburg also served as an economic research advisor for Amalgamated Transit Union (from 1997 to 2007), during which time he worked on public-transit funding and transit legislation in Illinois. *See id.* at 5.

In Dr. Ginsburg's opinion, "the [t]axi system is an essential part of the transportation system maintained and regulated by the City [of] Chicago, the counties in Northeast Illinois and the State of Illinois." [121-13] at 10. This ultimate conclusion rests on three supporting conclusions: first, that taxi service is an essential component of providing transportation services to individuals eligible for assistance under the Americans with Disabilities Act; second, that taxi service is an important component of the City's efforts to promote tourism; and finally, that taxi service is needed to fill gaps in the public-transit system by providing "what is referred to as 'last mile' transportation and transportation in unusual circumstances." *Id.* The parties dispute whether these opinions are admissible.

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), "the district court is tasked with determining whether a given expert is qualified to testify in the case in question and whether his testimony is scientifically reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Daubert*, 509 U.S. at 592–93). The City argues that Dr. Ginsburg meets neither requirement, and that his opinions therefore should be excluded from the summary-judgment record. *See* [144] at 26.

The City maintains that Dr. Ginsburg is unqualified to render the above-cited opinions because he holds degrees only in chemistry—irrelevant to the issues on which he claims to be an expert—and because he worked for only two years in transportation for Cook County, where he performed mostly budget-related and "HR" functions. *See id.* Whether a witness is qualified to give expert testimony must be determined by "comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton*, 593 F.3d at 616 (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)); *see also Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) (discussing the requirements of Rule 702 of the Federal Rules of Evidence). Each of Dr. Ginsburg's conclusions must be examined individually to determine if he has adequate education, skill, and training to reach that conclusion. *See Gayton*, 593 F.3d at 617.

Dr. Ginsburg first concludes that "[t]axi service is an essential component of the provision of transportation . . . services to individuals eligible for assistance under the Americans with Disabilities Act (ADA)." [121-13] at 10. According to Dr.

Ginsburg, the Taxi Access Program (TAP)—a city program that requires Chicago taxicab drivers to offer reduced rates to disabled customers—is "necessary to . . . provide sufficient service to meet the needs" of such persons. *Id.*[13] Dr. Ginsburg may not offer an opinion on what is required under the ADA or, consequently, on what constitutes services "sufficient . . . to meet the needs of" individuals qualified for protection under the Act. What is required by the ADA is an issue of law, not of fact, and thus is not an appropriate topic for expert-witness testimony. On the other hand, whether taxicab service is "an essential component" of transportation services that are otherwise provided to ADA-qualified individuals is an issue of fact on which an expert may conceivably opine.[14] Dr. Ginsburg, in other words, may (in theory) be qualified to offer an opinion on whether taxicab services are important or significant to persons deemed disabled under the ADA.

The City contends that Dr. Ginsburg is not qualified to give such an opinion (or, for that matter, to reach any other conclusion in his report) because Dr. Ginsburg focused primarily on budget management and human-resources issues while working in the Department of Transportation and Highways for Cook County.

---

[13] The Taxi Access Program provides individuals who have been certified as "paratransit customers" the opportunity to travel by taxicab at reduced rates if that travel originates in the City of Chicago. *See* Exhibit B to Ginsburg Expert Report, Taxi Access Program (TAP): Customer Guide (November 1, 2011), [121-13] at 19. Under TAP, certified paratransit customers may purchase a limited number of one-way taxicab rides for only $5.00 each (up to a value of $13.50 per ride). *See id.*

[14] Who is qualified (or "eligible") for protection under the ADA is also a legal issue and so, too, is a topic that Dr. Ginsburg may not properly reach. Consequently, I understand Dr. Ginsburg's references to "individuals eligible for assistance under the [ADA]," [121-13] at 10—and, similarly, to "ADA eligible individuals," *id.*—to concern persons who, under applicable legal precedent, necessarily fall within the sweep of the statute's protections.

*See* [144] at 26. Dr. Ginsburg did, as defendant says, have "fiscal management" responsibilities within the County's Department of Transportation, and he did also manage "Personnel/HR functions" there. *See* C.V. of Robert E. Ginsburg, [121-13] at 4. But he did not do *only* those things. He also designed and managed the implementation of a Long Range Transportation Plan, *see id.*, and his experience includes analyzing and developing "regulations and legislation regarding transportation and public transit in the Chicago region," [121-13] at 10.[15] These aspects of Dr. Ginsburg's background must also be taken into account. *See Gayton*, 593 F.3d at 616 ("The court should . . . consider the proposed expert's full range of experience . . . .") (citation omitted).

Nevertheless, Dr. Ginsburg has not provided enough detail about his background and experience to reasonably conclude that he is qualified to render an opinion on the extent to which taxicab services are important to travelers deemed disabled under the ADA. Dr. Ginsburg offers only vague descriptions of his prior responsibilities while working for the County's Department of Transportation and the Amalgamated Transit Union, and none of these descriptions suggests that he gained from his work any special insight into the needs and activities of disabled travelers in Chicago. For example, Dr. Ginsburg claims to have worked for the

---

[15] It is unclear from Dr. Ginsburg's report where he gained this experience. Based on his C.V., I assume that Dr. Ginsburg worked on transit-related regulations and legislation while serving as an economic research advisor for Amalgamated Transit Union. *See* [121-13] at 5 (listing as "Projects & Accomplishments" for the Union: "[d]eveloped legislative proposals on Public Transit Funding"; "[p]repared and presented testimony/reports at legislative hearings"; and "[a]cted as an analyst for Chair of IL House Mass Transit Committee with the responsibility of executing several sections of 2008 IL transit legislation including Performance Management." *Id.*

County on a "Long Range Transportation Plan." *See* [121-13] at 4. But he provides no information about what this plan actually entailed. Similarly, Dr. Ginsburg states that while working as an advisor for the Union, he "[d]eveloped legislative proposals" regarding public-transit funding, prepared (presumably related) reports, and "execut[ed] several sections of [the Illinois] transit legislation" in 2008, including Performance Management. *See id.* He does not explain whether, if at all, this work touched on transportation for disabled individuals.

Dr. Ginsburg's second conclusion is that taxi service is an "important component" of the City's efforts to promote tourism in Chicago. *See id.* at 10. However, the lack of detail concerning his background again prevents a finding that Dr. Ginsburg is qualified to form the opinion he now offers. It is not apparent that, from the experiences discussed above, Dr. Ginsburg acquired any specialized knowledge about tourism in Chicago, or about how the provision of taxicab services intersects (or to what extent) with that industry. General references to prior work on transportation plans and transit-related legislation are insufficient.

Dr. Ginsburg's third conclusion is that taxicabs are necessary to fill gaps in the City's public-transit system, such as by providing "last mile" transportation, *see id.* Whether Dr. Ginsburg is qualified to reach this last conclusion is a closer question. He states in his report that this conclusion is based on: Dr. Ginsburg's ten years of experience analyzing and making recommendations on Chicago Transit Authority (CTA) budgets and state legislation for the Amalgamated Transit Union; two years working as a consultant to the Regional Transportation Authority

concerning performance-management requirements for the CTA (and other regional transportation entities);[16] and his two years of experience with the County's Department of Transportation and Highways. *See id.* It is certainly conceivable that, while performing such work, Dr. Ginsburg obtained particular insight into the intricacies of the transit system in Chicago—and, more critically for present purposes, that he acquired some specialized knowledge concerning whether, and to what extent, taxicabs may fill any gaps in such a system. Once again, however, his C.V. and report make clear only that he worked generally on transportation-related projects in Chicago. These materials do not provide specific details about those projects, and so do not provide enough facts to reasonably conclude that Dr. Ginsburg is qualified to offer an opinion on the gap-filling potential of taxicab services in the larger transit system of Chicago.

Dr. Ginsburg is not qualified, on this record, to reach any of the three conclusions appearing in his report. He therefore is not qualified to offer the more general opinion—that taxicabs are "an essential part of the transportation system maintained and regulated by the City," *id.*, since that opinion is based on the three supporting conclusions just discussed, *see id.* Because Dr. Ginsburg's opinions are not admissible due to his lack of qualification, I do not reach defendant's argument

---

[16] Very little is mentioned in Dr. Ginsburg's C.V. about his work for the Regional Transportation Authority. He lists the Authority as one of his "[k]ey clients managed" in 2008 through 2010, but does not provide any information about the details of that work. *See* [121-13] at 5. He otherwise describes his responsibilities during that period as generally involving consulting work focused on providing economic analyses, strategic research, and campaign design, as well as providing evaluations of investment potential and the viability of business proposals. *See id.*

that Dr. Ginsburg's opinions are also unreliable (and thus inadmissible under *Daubert* on separate grounds), *see* [144] at 26.[17]

Moreover, the undisputed benefits that taxicabs provide to the City (as identified by Dr. Ginsburg) do not support Callahan's conclusion that her work renders service to the business of the City. First, it is undisputed that the City requires taxicab affiliations and medallion holders to charge reduced rates to disabled riders. *See* Exhibit B to Ginsburg Report, Taxi Access Program (TAP): Customer Guide (2011), [121-13] at 19; Exhibit C to Ginsburg Report, Rules and Regulations for Affiliations (2001), [121-13] at 33; 2008 Medallion Holder Rules, [121-22] at 43 (Rule 12.01).[18] Regulations require taxicab affiliations to ensure that

---

[17] The City faults Dr. Ginsburg's statements for not being based on "scientific, technical, or specialized knowledge," and highlights that Dr. Ginsburg himself has admitted: (1) that his opinions may not be tested by any "prevailing standard"; and (2) that he has not relied on any quantitative data or applied a "scientific method." *See* [144] at 26. For the reasons discussed above, I do not decide whether Dr. Ginsburg's opinions are reliable enough to pass muster under *Daubert* as codified in Rule 702 of the Federal Rules of Evidence. I merely note that the standard of reliability as set forth in Rule 702 is a flexible one: the specific factors enumerated in that rule—including whether the testimony is based on "sufficient facts or data," and whether the testimony is "the product of reliable principles and methods," Fed. R. Evid. 702—must be applied only "where they are reasonable measures of . . . reliability," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (emphasis added); *see also id.* at 150 ("[T]he gatekeeping inquiry must be tied to the facts of a particular case." (quoting *Daubert*, 509 U.S. at 591)) (internal quotation marks omitted). Reliability, in other words, does not always require the kind of rigorous quantitative analysis typically found in more data-driven opinions or testimony.

[18] Dr. Ginsburg relies on the Rules and Regulations for Affiliations dated December 23, 2001. *See* Exhibit C to Ginsburg Report, [121-13] at 30. The December 2001 rules and regulations were promulgated pursuant to Section 2-24 of the Municipal Code of Chicago, *see id.* at 31, which has since been repealed. The current version of the applicable rules and regulations (now entitled "Taxicab Medallion License Holder Rules and Regulations," effective July 1, 2012) were promulgated pursuant to Chapters 2-25 and 9-112 of the Code. *See* [121-28] at 1–2. (Chapter 2-25 of the Code describes the powers and duties of the

only TAP-qualified taxicab drivers are dispatched to answer requests from TAP-eligible passengers for taxicab services, and that discounts are provided to TAP-eligible patrons who hail cabs on the street. *See* [121-13] at 34 (Rule No. 2.3(f)); TAP Customer Guide, *id.* at 22. But there is an important difference between requiring taxicab affiliates to offer reduced *rates* (for transportation that the taxicab affiliates have already chosen to provide), and requiring affiliates to provide taxicab *rides* in the first instance. The latter is the business to which Callahan renders service—providing transportation by taxicab. TAP is a service offered by the City to ADA eligible customers, but the "service" offered is a reduction of prices for preexisting taxicab services, not a provision of those services in the first place. If a taxicab affiliate has not decided to use its medallions, then participation in TAP effectively requires no action at all. Rate-setting regulates—and the City may stand to benefit in some way from that regulation—but it does not cause the City to take on the regulated business as its own.

Similarly, the City stands to benefit from setting a simplified rate structure and standardized procedures for taxi transportation to and from airports—and the City announces the existence of these services. In addition, says Dr. Ginsburg, taxicabs "provide options for people with lots of luggage," and for those who work late or who are unfamiliar with the area (tourists). *See* [121-13] at 11. The "City of Chicago and the transit agencies," he says, "need to provide a variety of options and additional convenience to such travelers," since the bus-and-train system is not

Business Affairs and Consumer Protection Department, as discussed earlier. *See* MCC § 2-25-050.)

always sufficient to meet their needs.[19] *Id.* But Dr. Ginsburg points to no evidence that the City must provide transportation of any kind; and his opinion that the City *should* provide transportation by taxicab misses the point. The crucial question is not whether the City ought to provide transportation by taxicab, or whether it benefits from the provision of such services by others. The relevant question is whether the business to which Callahan renders service is the City's. Dr. Ginsburg merely identifies a positive consequence of having taxicabs in Chicago: flexibility for travelers. But the City does not provide the service, does not mandate the service, and does not require medallion holders to use their medallions for tourists or anyone else.

c.    Return on Medallion Investments

Citing *Yellow Cab v. City of Chicago*, 919 F.Supp. 1133 (N.D. Ill. 1996), Callahan argues that the City must be "in the taxi business" because medallion owners spend hundreds of thousands of dollars to acquire taxicab medallions, and the City has a constitutional obligation to ensure a reasonable return on those investments. *See* [120] at 33 (citing *Yellow Cab*, 919 F.Supp. at 1140). Callahan's reliance on *Yellow Cab* is misplaced.

In *Yellow Cab*, a taxicab affiliation sued the City of Chicago alleging, among other things, that the City had effected an unconstitutional taking of the affiliation's property by setting maximum taxicab lease rates. *See* 919 F.Supp. at

_____

[19] The "bus-and-train" system is not provided by the defendant. As Dr. Ginsburg noted at his deposition, the Chicago Transit Authority and the Regional Transportation Authority are entities distinct from the City of Chicago. *See* June 20, 2014 Deposition of Robert Ethan Ginsburg, [143-10] at 7–8.

1140. The affiliation contended that the lease rates set by the City did not permit the affiliation to charge enough for its leases in order to pay its own expenses and earn a reasonable rate of return on the medallions it had acquired. *See id.* The question in *Yellow Cab* was whether the maximum lease rates as set by the City were so low as to be confiscatory of the affiliation's property (*i.e.*, its medallions). *See id.* Whether the City directly or in effect provided transportation by taxicab was not at issue in that case, and the theoretical possibility that a government could confiscate or take a business does not mean that that business is the government's for purposes of the FLSA.

### d.    The City's Role in Relation to Medallion Owners

Finally, Callahan argues that the City is "in the taxi business" because the City: (1) has effectively usurped the role of taxicab affiliates, who used to control taxicab drivers through an employer-employee-type relationship; and (2) acts in those affiliates' interests. *See* [120] at 23–25, 31. Callahan first relies on *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. NLRB*, 603 F.2d 862 (D.C. Cir. 1978), for the proposition that the City has stepped into the shoes of the medallion owners.

*Democratic Union* is unhelpful to Callahan. In that case, the D.C. Circuit examined two taxicab affiliations in Chicago—Yellow Cab and Checker—which had recently switched from the traditional "commission system" to a newer lease-based system. *See id.* at 866. Under the commission system, the taxicab affiliations would earn money by taking a certain percentage of the fares paid to the individual

drivers who used those companies' cabs. *See id.* In 1975, however, the companies retired the old system and replaced it with a new one—a leasing system—in which drivers would keep their fares and instead pay the cab companies a flat rate for use of the licensed taxicabs. *See id.* When the National Labor Relations Board concluded that the companies were still the employers of the drivers under the National Labor Relations Act (and were thus obligated to bargain with the drivers' union representative), the companies filed suit under the NLRA to challenge that order. *See id.* at 866, 868. The Court of Appeals determined that the drivers were not the companies' employees under the Act, because the companies imposed "virtually no control . . . over the lessee-drivers, independent of municipal regulations." *Id.* at 875. "Government regulations," the court observed, "constitute supervision not by the employer but by the state." *Id.*

Callahan would read *Democratic Union* to stand for the proposition that, if the taxicab affiliates who lease the use of their medallions are not the employers of the lessees, then the government must be (since it now "supervises" the drivers through regulation). But this is not what *Democratic Union* says. The court in that case stated only that a putative employer is not "controlling the driver" when it obligates him or her to comply with the law. *See id.* The court did not opine that, by eliminating through regulation the need for supervision or control by a direct employer, the City itself had *become* that employer. To the contrary, the court concluded that the lessee-drivers "essentially work[ed] for themselves." *Id.* at 877.

Callahan asserts that even if the City is not her direct employer, it is nonetheless her employer under the FLSA because it acts "in the interest of" the medallion owners who, according to Callahan, are "unquestionably in the taxi business." [120] at 24–25. Here Callahan relies on Section 203(d) of the FLSA, *see id.* at 24, which states that the term "employer" as used in the Act includes "any person acting directly or indirectly in the interest of an employer[,] and includes a public agency," 29 U.S.C. § 203(d). But Callahan's analysis is not quite correct. Even assuming that, in regulating taxicabs, the City of Chicago is acting in the interest of the medallion owners (addressed further below), Callahan has not provided any evidence suggesting that the medallion owners, under the current lease-based system, are indeed the employers of the lessee-drivers who drive their cabs. In fact, Callahan argues just the opposite: she contends, as just discussed, that the City has *replaced* the taxicab affiliate as the employer. *See* [120] at 24 (discussing *Democratic Union*); *see also id.* (arguing that the medallion owner "*used to be* the employer") (emphasis added). If the taxicab affiliates are no longer the drivers' employers, then the City is not acting "in the interest of an employer" even if it has somehow acted in the interests of the medallion owners.

Nor am I persuaded that the City has indeed acted in the medallion owners' interests. Callahan maintains that the City must have done so, since it now "supervises" drivers' conduct such that the medallion owners no longer have to. *See* [120] at 24. But Callahan casts too wide a net. In essence, she argues that the City acted in the medallion owners' interests because the owners derived a benefit from

the City's regulation—that is, relief from having to supervise or otherwise monitor taxicab drivers' behavior. Such a reading of Section 203(d), however, would render the reach of that provision virtually boundless. Under Callahan's interpretation, a government or regulatory agency would by statute "employ" any person whose direct employer relied on ordinances, rules, or regulations to set the parameters of an employee's job performance. There is no reason to assume this was Congress's intent in drafting the FLSA.

The FLSA is a broad statute, and those who reap the benefits of another's labor (*i.e.,* those who suffer or permit others to work) can be employers under the Act—even if they are not the direct source of the worker's remuneration, or the sole entity with control over wages or income earned. *See, e.g.*, *Reyes*, 495 F.3d at 406–09 (discussing the concept of joint employment); *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 326–29 (5th Cir. 1993) (concluding that the defendant nightclub owners "employed" several dancers who used the club's stages, even though the dancers were paid only in tips from the club's customers and not by the owners themselves). But FLSA liability requires that the work at issue be primarily and necessarily for the benefit of the defendant-employer's business. This was true in *Circle C.*, for example, where the workers were required to comply with weekly work schedules set by the defendants. *See* 998 F.2d at 327 (noting that the nightclub owners would fine the dancers for any non-compliance with the schedule). By mandating that certain hours be worked, the defendants in that case not only benefitted from the dancers' work, but made the dancers' business their own. The defendants, in other

words, made dancing a part of their nightclub business. Here, however—while the City of Chicago created and now regulates the market for transportation by taxicab (and benefits from the existence of taxicabs)—the City does not provide to its residents or visitors transportation by taxicab, either directly or indirectly. Callahan therefore did not work for the City within the meaning of the FLSA, since her activities were not necessarily and primarily for the benefit of the City's business.[20] *See* 29 C.F.R. § 785.7. Thus, as a matter of law, the City did not suffer or permit Callahan to work within the meaning of the FLSA, and so did not "employ" her under that Act.

### 2. The "Economic Reality" of Callahan's Relationship with the City

The parties focus a great deal on the Seventh Circuit's opinion in *Secretary of Labor v. Lauritzen*, in which the court articulated a series of six criteria to be considered when determining whether a given worker is an employee under the FLSA. *See* 835 F.2d at 1534–35. The criteria, explained the court, are meant to assist in assessing the "economic reality of the . . . working relationship." *Id.* at 1534. Those six criteria are:

1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon [her] managerial skill;

---

[20] The question that must be answered in this case is whether the business to which Callahan renders service (transportation by taxicab) is the City's business. Defining the extent to which the City may have other businesses (if any) under the FLSA, or what those businesses might be, is not necessary to resolve the parties' cross-motions.

3) the alleged employee's investment in equipment or materials required for [her] task, or [her] employment of workers;

4) whether the service rendered requires a special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1535. No single factor or criterion is controlling, however, as it is the totality of the circumstances surrounding the work activity that must be evaluated. *See id.* at 1534.

As the City points out, the *Lauritzen* test is an awkward fit for this case. *See* [93] at 11–15. The factors described in *Lauritzen* are most logically applied to situations where it is clear that the defendant hired the plaintiff to perform a certain kind of work (specifically, agricultural work). In such cases, the issue to be resolved is whether the plaintiff was hired as an "employee" or merely as an "independent contractor." *See Lauritzen*, 835 F.2d at 1535. Here, however, the facts suggest that Callahan was never really hired by the City at all. She did not interview with the City; she was never told that she had been hired to work for the City; she did not receive any tax- or employment-related forms from the City; and once she obtained her public chauffeur's license, she never informed the City of any absences that she took from driving a taxicab (such as vacation or sick days). *See* [122] at 2, 5 ¶¶ 3–4, 15–16. Thus, the question here is not really whether Callahan was hired as an employee rather than as an independent contractor, but whether she became a sort of *de facto* employee of the City when she obtained her public

chauffeur's license (and thus became subject to certain municipal regulations if and when she decided to use her license).

Despite the awkwardness of applying *Lauritzen*'s six-factor test to the scenario at hand, *Lauritzen* is a decision of the Seventh Circuit on the meaning of "employ" under the FLSA, and it is not my place to disregard it.[21] Even under the *Lauritzen* analysis, however, Callahan is not an employee of the City of Chicago within the meaning of the FLSA: although a few of the six factors weigh in her favor, Callahan is not economically dependent on a business of the City.

> a. <u>Factors Favoring Employee Status</u>

A few of the *Lauritzen* factors support Callahan's claim. The first is the nature and degree of control over how Callahan performs her work. *See Lauritzen*, 835 F.2d at 1535. The City contends that it does not control the day-to-day details of how Callahan performs her job, such as: when to start or stop driving for the day (or to take breaks); where to look for potential passengers; how to interact with passengers; what to wear while driving; or which exact route to take to a given destination. *See* [93] at 17–21. But the City's focus is too narrow. A defendant's right to control is relevant under *Lauritzen* even where that right "applies to the entire . . . operation, not just the details" of that operation. 835 F.2d at 1536. Even if

---

[21] A multi-factor test that does not provide clear weights to merely illustrative factors is subject to the criticism that it creates an illusion of objectivity and predictability. *See Teed v. Thomas & Betts Power Solutions, LLC*, 711 F.3d 763, 766 (7th Cir. 2013). In *Lauritzen* itself, the factors were not particularly useful. The majority opinion walked through them, but ultimately focused on the question of economic dependence, *see* 835 F.2d at 1538 (treating other factors as "aids-tools"), and the concurring opinion explained a number of deficiencies in the multi-factor approach, *see id.* at 1540–45.

the City does not dictate the nuances of how Callahan drives a taxicab for pay, she is nonetheless subject to a plethora of rules and regulations, set by the City, that govern the operation of taxicabs as a whole. Moreover, the City can and does enforce those regulations. In each of the years from 2009 to 2012, for example, the City issued more than 1,600 citations to taxicab drivers for "discourtesy." *See* [142] at 4 ¶ 12. And in 2012, the City fined 39 drivers for failing to take the "most direct route" to their passenger's chosen destination, *see id.* at 4 ¶ 14. Although the City may not control every aspect of how taxicab drivers perform their work, it nonetheless maintains significant control over the operation of taxicabs. The first *Lauritzen* factor therefore weighs in plaintiff's favor.

Also in plaintiff's favor is the fourth *Lauritzen* factor: whether the service rendered requires a special skill, 835 F.2d at 1535. Although at least some skill is required to drive a taxicab in Chicago—*e.g.*, familiarity with the City's geography, knowledge of where one-way streets are located, *see* [93] at 26—such skills are not sufficiently specialized. These are not skills, in other words, that require a substantial amount of particular training. (Indeed, the training course that Callahan took to get her public chauffeur's license lasted for only two weeks. *See* [122] at 1 ¶ 2.) Because an unskilled job suggests the worker is poor in human capital, it "augurs for a conclusion of employment." *Lauritzen*, 835 F.2d at 1541 (concurring opinion).

b.    Factors Favoring Non-Employee Status

The remaining *Lauritzen* factors tend to show that Callahan is not an employee of the City of Chicago within the meaning of the FLSA.

The third criterion focuses on the parties' respective investments in equipment or materials required to complete the work at hand. *See Lauritzen*, 835 F.2d at 1535, 1537. To the extent the putative employee made a disproportionately small investment in the venture as compared to the putative employer, she is more likely to be economically dependent on that entity or individual. *See id.* at 1537. Taxicab drivers like Callahan invest in their driving. For example, drivers must spend money to acquire and maintain their public chauffeurs' licenses—first by completing a mandatory training course (for which Callahan paid $275) and by paying a licensing fee ($15), then by paying any applicable renewal fees ($8 per application), *see* MCC §§ 9-104-030(2), 9-104-070. Taxicab drivers must also lease a cab if they do not own one themselves. Lessee-drivers like Callahan may have to pay for gas, too, or for MPEA tax stamps. *See* [122] at 10 ¶ 31. Callahan also purchased a guidebook containing a list of Chicago streets, and occasionally spent money on car washes to keep the taxicabs clean. *See id.*

On the other hand, lessee-drivers such as Callahan do not have to pay for the major capital investments—the taxicab medallions or the taxicabs themselves. But who makes those? It is not the City, as the City does not even own any taxicabs. *See id.* at 9 ¶ 26. It is the medallion owner who pays for—and thus invests in—the taxicab, and the medallion owner who pays for and invests in the license to use it

(*i.e.*, the medallion). That the City collects revenue from and thus benefits from medallion sales is inconsequential, since the City retains that money even if the medallion owners do not use those licenses by putting taxicabs into service. The City has made no major investment in Callahan's driving that it stands to lose. Relative to the City, Callahan made a disproportionately large investment in driving a taxicab, and this *Lauritzen* factor therefore weighs in the City's favor.

The fifth criterion is the "degree of permanency and duration of the working relationship." 835 F.2d at 1535. Permanency suggests that the worker is economically dependent on the putative employer. In assessing the permanency of a working relationship, it does not matter that a given relationship is temporary. Temporary work relationships—*e.g.*, seasonal work relationships—may be permanent and exclusive for their duration, and thus "permanent" under *Lauritzen*. *See id.* at 1537 (citing *Donovan v. Gillmor*, 535 F.Supp. 154, 162–63 (N.D. Ohio 1982))).

Callahan argues that any full-time work as a licensed taxicab driver is "permanent work" for FLSA purposes, and that she therefore qualifies as a permanent worker because she drove a taxicab full time for two years. *See* [120] at 29. The problem with this argument is that it conflates licensure (*i.e.*, permission) to perform a given task with an affirmative request to perform that task. The latter is what occurred in *Lauritzen*, where the defendants (pickle/cucumber farmers) hired the plaintiffs (migrant families) to do something particular to benefit the defendants' business (pick pickles/cucumbers during harvest season). *See* 835 F.2d

at 1532. There was, in other words, at least an implicit expectation on the defendants' part that the plaintiffs would—for several months—do what had been asked of them: pick pickles. *See id.* (noting that harvest season typically lasted from July through September). Here, by contrast, the City had no such expectation. While the City granted Callahan permission to use its streets for the purpose of driving a taxicab for hire, there was no requirement that Callahan—or any other licensed chauffeur—actually take advantage of that permission by driving a taxicab. Licensed taxi drivers, in other words (and as discussed further above), need not actually use their licenses. Thus, while it may be that Callahan chose to use and did use her license consistently for a period of two years, there is no evidence suggesting that the City had any expectation that Callahan would do so, or even knew about it when she did. Callahan's work therefore was not "permanent work" for the City within the meaning of *Lauritzen*. *See* 29 C.F.R. § 785.11 (explaining that "working time" under the FLSA is time that the "employer knows or has reason to believe that [the employee] is continuing to work"). This factor therefore suggests non-employee status, and weighs in defendant's favor.

The parties vigorously dispute whether Callahan had an opportunity for profit or loss depending on her managerial skill, such that she was economically independent of the City. *See Lauritzen*, 835 F.2d at 1535 (second factor). While the City maintains that Callahan had "significant control" over her ability to increase her earnings (and therefore her profits) as a taxicab driver, *see* [93] at 23–25, plaintiff argues that she had next to no control at all, *see* [120] at 20–23. At the

heart of the parties' debate is the undisputed fact that the City, in regulating taxicab operation, sets the maximum fare rates that drivers may charge their passengers.

Defendant contends that, despite its control over maximum fare rates, lessee-drivers such as Callahan nonetheless have substantial opportunity to increase their actual earnings, and thus their profits, because: fares come from passengers; passengers may pay more than the maximum chargeable fare rate (*i.e.*, they may include a tip); the more passengers are driven, the more the driver earns (in fares and tips); and drivers determine how best to maximize (1) the number of passengers they transport and (2) the tips that those passengers pay. *See* [93] at 23–24.

The undisputed facts do suggest that drivers have at least some control over how many passengers they transport—and, consequently, how many fares they collect—in a given time period. Drivers may keep track of large public events, for example (such as sports games or theatre productions), and seek out potential fares at those times and locations. *See* [122] at 12 ¶ 37. Similarly, some drivers may avoid looking for possible fares at airports, as they do not find such trips to be a good investment of their time, *see* [148] at 7 ¶ 13. When Callahan herself drove a leased taxicab, she decided where and when to look for passengers in need of a ride (unless she received a dispatch call from the taxicab affiliate). *See* [122] at 4 ¶ 10. Moreover, the current regulation limiting the number of consecutive hours a taxicab driver may drive (*see* MCC § 9-112-250(a)) was not in effect between January 2009 and August 2011, *see* [122] at 4 ¶ 9, and so Callahan was also free—within the

boundaries of a given lease—to decide how many hours she would drive a taxicab per day.

The facts also suggest that taxicab drivers have at least some opportunity to earn larger tips based on their managerial skills. Some drivers, for example, receiver larger tips because they build customer loyalty with individualized service. *See* [148] at 8–9 ¶ 16. Some drivers garner larger tips because they market themselves in unique ways or provide certain amenities for their passengers. *See id.* at 8–9 ¶¶ 16–17. And some drivers may try to improve their earnings by avoiding areas where the passengers typically provide smaller tips. *See id.* at 12 ¶ 25.

The City argues that lessee-drivers such as Callahan may also increase profits by minimizing expenses. The facts do indicate that this is true—at least to a certain extent. It was Callahan herself, for example, who selected the taxicab affiliate(s) from whom she would lease her cabs. *See* [122] at 14 ¶ 41. And although the City sets the maximum lease rate that an affiliate may charge for the use of its medallions, *see* MCC § 9-112-230, Callahan points to no evidence that the City has set a minimum such rate. The City, in other words, did not prevent Callahan from attempting to negotiate a lease rate lower than those set forth in the Municipal Code. *See* [122] at 14 ¶ 43. (Though, conversely, defendant points to no evidence that medallion holders actually offer or agree to rates lower than the maximum rates as set by the City.) Expenses may also be lowered by shopping for and purchasing gas at lower prices, minimizing the amount of gas used (by, for example,

decreasing use of air conditioning or accelerating more smoothly), and driving more carefully so as to avoid accidents. *See id.* at 16 ¶¶ 48–49.

Thus, even when viewing the evidence in the light most favorable to Callahan the facts suggest that there are at least some opportunities for taxicab drivers to earn more, or to spend less, based on their managerial skills. Callahan does not dispute that such opportunities exist in theory. Rather, she asserts that these opportunities are in truth severely limited, and that they therefore permit only small variations in profits that drivers actually earn. Callahan, in other words, argues that there is no appreciable or meaningful opportunity for profit or loss that is truly within the taxicab driver's control. *See* [120] at 28.

The City limits the opportunity to profit, says Callahan, by setting maximum fare rates and imposing a variety of "common carrier"-type obligations that circumscribe a driver's ability to actually use managerial skills. *See id.* at 26. Callahan identifies only two of the "common carrier" duties that she claims are unduly restrictive—the obligation to "return lost property left in [drivers'] cabs," and the obligation to service "underserved" areas, *id.*—without explaining how fulfilling these obligations necessarily limits drivers' abilities to increase their earnings based on skill. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments . . . are waived.") (citation omitted). And while the City does prescribe the maximum fares that drivers may charge their passengers, Callahan admits that drivers may earn money not just through fares, but through tips, and that some drivers earn larger tips because they do certain

things that *are* within their control, such as providing entertainment in their cabs. The relevant question is not whether taxicab drivers can increase (or decrease) their profits through how they approach their driving—since Callahan essentially concedes that they may—but by how much (and, if the answer is "not much," whether it is the City that prevents drivers from profiting through skill).

According to Callahan, taxicab drivers operating under the City's rules and regulations (as all cab drivers in Chicago must) are simply unable to increase their profits to any significant extent. In support of this contention, she offers a report prepared by Dr. Robert Bruno. *See* [120] at 26–28. Dr. Bruno explains that he performed an analysis of fares earned from November 2013 through January 2014 by 689 taxicab drivers working for three affiliates in Chicago. *See* [121-12] at 24. Based on these records, Dr. Bruno calculated average fares earned per hour, as well as average charges[22] earned per hour, and concluded that there was "minimal variability" among average earnings. *Id.*

The City argues that Dr. Bruno's conclusions are inadmissible because the methodology he used to reach them was flawed. *See* [144] at 17–19. Some of the City's criticisms are about Dr. Bruno's data, not his methodology. The reliability of an expert's testimony is "primarily a question of the validity of the methodology employed by [that expert], not the quality of the data used in applying the methodology." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). In assessing the admissibility of an expert's opinion, a court should not "unduly

---

[22] Dr. Bruno does not explain what he means by "charges."

scrutinize[] the quality of the expert's data and conclusions." *Id.* (citation omitted). To the extent the data used by Dr. Bruno did not include tips earned by the participating taxicab drivers, those data are questionable. Tips are part of drivers' earnings (as Dr. Bruno admits, *see* [148] at 16 ¶ 32); thus, if the data Dr. Bruno analyzed did *not* include such tips, then Dr. Bruno assessed only a portion of what the drivers actually earned (assuming, that is, that at least some of the participating drivers did earn tips). That the data used by Dr. Bruno may not have included tips is especially troubling because obtaining larger tips is one way in which taxicab drivers may augment their incomes through individual skill—the very factor Dr. Bruno's report is supposed to enlighten. But this is a data-quality issue, not one of methodology.[23] Similarly, that Dr. Bruno did not take into account any breaks from driving that the drivers may have taken—such as breaks for meals, or to use the bathroom—is a problem with his data, not his methodology.

Dr. Bruno "cleaned" the data set before using it—first by eliminating records whose hours were listed as greater than 14 hours per shift (since driver shifts were at that time limited to 12 hours, and a 14-hour cutoff allowed for a "reasonable delay or time overage"); and, second, by removing records of drivers who worked fewer than 20 hours over 3 months. *See* [121-12] at 24. This is indeed a question of methodology, but it is not clear how removing these records from the original data set would necessarily alter the results in Callahan's favor. What is relevant to Callahan's position at summary judgment are Dr. Bruno's calculations of average

---

[23] Dr. Bruno used data he received from another source, *see* [121-12] at 24, and it is unknown whether those data included tips, *see* [148] at 15–16 ¶ 32.

fares and charges earned per hour, and the variability of those earnings. There is no evidence suggesting that drivers who claim to have worked more than 14 hours per shift likely earned more or less *per hour* than those who worked fewer than 14 hours per shift Nor is there evidence that drivers who worked fewer than 20 hours over the three-month study period are an important subset of the data originally obtained. Dr. Bruno's calculations concern amounts earned by drivers per hour. Eliminating the extremes of a data set before analyzing that set is not an uncommon practice in statistical or scientific analyses, and there is no indication that the practice was problematic here.

The City also takes issue with another aspect of Dr. Bruno's methodology: he "artificially homogenize[d]" the data points, says the City, thereby concealing the true distribution or spread of drivers' incomes, and reducing their calculated variability. *See* [144] at 18–19. This argument, too, is properly related to the methodology that Dr. Bruno employed in his analysis, and so bears on the admissibility of Dr. Bruno's report. Although Dr. Bruno could (and should) have done a more thorough job of explaining in his report how he performed his calculations—and thus what his methodologies truly entailed—at least some of his conclusions are admissible.

Dr. Bruno states that from the 689 driver records left in the data set (after "cleaning"), he calculated: (1) the average fares and average charges per hour, first for each of the three taxicab affiliates, then in total; and (2) the average fare variation and average charge variation, again by taxicab affiliate and then in total.

*See* [121-12] at 24–25. On the second page of his report, he includes the following summary[24]:

| Affiliate | Drivers | Avg Fare/Hour | Avg Fare Variation | Avg Charge/Hour | Avg Charge Variation |
|---|---|---|---|---|---|
| Chicago Taxi Medallion | 5 | $ 16.60 | $ (0.35) | $ 18.54 | $ (0.72) |
| VTS Globe Taxi | 271 | $ 16.26 | $ (0.69) | $ 18.40 | $ (0.86) |
| VTS Medallion Leasing | 413 | $ 17.46 | $ 0.51 | $ 19.90 | $ 0.64 |
| All Drivers | 689 | $ 16.95 | $ 0.34 | $19.26 | $ 0.34 |

*Id.* at 25. As the City points out, comparing the average fare variation between affiliates, or between one affiliate and all drivers, does not reveal much, if anything, about whether drivers have an opportunity to earn money through skill, because such a comparison hides the individualized data that it otherwise purports to explain.

As depicted in the chart above, Dr. Bruno first calculated the average fare (and charge) per hour for each of the three taxicab affiliations whose drivers participated in the study. He also calculated the average fare (and charge) across "all drivers."[25] Dr. Bruno then determined the "average variation in fare per hour and charge per hour," first for each of the three affiliations, then in total.

To obtain the average variations per hour for each taxicab affiliation, Dr. Bruno subtracted the average per hour for that affiliation from the total average for

---

[24] The table included here is a representation of the chart included in Dr. Bruno's report. The formatting between the two differs slightly, but the contents are the same.

[25] To perform the latter calculation, Dr. Bruno added up the total amounts in fares and charges collected by all participating drivers, and divided by the total number of hours those drivers worked. *See* Figure 1 of Bruno Report, [121-12] at 24.

all drivers.[26] This approach, without further explanation, is rather strange, and the results it yields are not informative. By subtracting one average (fare/charge earned per hour by all drivers) from another (fare/charge earned per hour by drivers in a given affiliation), Dr. Bruno has over-normalized the data.

To illustrate using a simpler example, suppose that there were two taxicab affiliations (A and B), each with two drivers participating in the study. The drivers at Affiliation A earned $8.00 and $12.00 in fares per hour, respectively. Thus, the average per-hour fare at Affiliation A was $10.00. The drivers at Affiliation B, however, earned $6.00 per hour and $14.00 per hour, respectively. The average fare per hour at Affiliation B was therefore also $10.00. The average fare for all four drivers, irrespective of affiliation, was (again) $10.00 per hour.[27] Dr. Bruno's method would subtract the per-hour fare average for all drivers ($10.00) from the per-hour fare average for the drivers at Affiliation A (also $10.00), and conclude that Affiliation A drivers on average do not vary from all drivers. If the same approach is followed for Affiliation B, the same result is obtained: [average fare per hour for Affiliation B ($10.00)] less [average fare per hour for all drivers ($10.00)] is zero. But these results are quite misleading, because we know from the data for Affiliation A that, on average, drivers there earned plus or minus *two* dollars from the per-hour average for all drivers. The "zero" variation result is even more off base

---

[26] Thus, for example, Dr. Bruno obtained "$ (0.35)" as the average fare variation for drivers in the Chicago Taxi Medallion affiliation: $16.60 (the average fare per hour for that affiliation) less $16.95 (the average fare per hour for all drivers in the study) is minus 35 cents. *See* [121-12] at 25.

[27] [$8.00 + $12.00 + $6.00 + $14.00] / 4 = $10.00.

for Affiliation B, where the drivers earned plus or minus *four* dollars from the per-hour average for all drivers. To claim that there is no variability would be incorrect, but that would be the outcome of Dr. Bruno's method.

By comparing "averages to averages," Dr. Bruno may have eliminated the spread or distribution in data points—thereby improperly narrowing the variability in results, as the City claims. The methodology Dr. Bruno used to calculate the affiliation-specific variations in fares (and charges) therefore was not reliable, and on that front, his report is not admissible under Federal Rule of Evidence 702. But the affiliation-specific calculations are not the only ones concerning income variability that Dr. Bruno performed. He also calculated the average variation in fare (or charge) per hour from the per-hour averages (fare and charge) for all drivers. *See* Figure 2 of Bruno Report, [121-12] at 25 (fourth row). Here, Dr. Bruno determined that 689 drivers earned on average $16.95 in fares per hour, and that the average variation from this number—*i.e.*, the average difference between this number and what the 689 drivers actually collected in fares—was $0.34.[28] This is

---

[28] Dr. Bruno does not explain exactly how he arrived at this figure. It is therefore possible that Dr. Bruno merely averaged the affiliation-specific variabilities that he had already calculated (*e.g.*, $(0.35), $(0.69), and $0.51 for fares earned per hour, *see* [121-12] at 25) in order to obtain an overall average. Such an approach would be inappropriate, as it would over-normalize the data as discussed above. However, there is no suggestion that Dr. Bruno followed such a method here. Merely averaging the affiliation-specific variabilities yields an overall average fare variation (per hour) of $0.52. ( [ | $(0.35) | + | $(0.69) | + $0.51 ] / 3 = $0.52.) But Dr. Bruno obtained $0.34. *See id.* Similarly, merely averaging the affiliation-specific variabilities for charges earned (per hour) yields $0.74 ( [ | $(0.72) | + | $(0.86) | + $0.64 ] / 3 = $0.74), while Dr. Bruno again calculated $0.34. *See id.* Nor does it appear that Dr. Bruno calculated *weighted* averages using the affiliation-specific variabilities, as those would come out to $0.58 and $0.73 for fares and charges, respectively ( [ | $(0.35) x 5 | + | $(0.69 x 271 | + ($0.51 x 413) ] / 689 = $0.58; and [ | $(0.72) x 5 | + | $(0.86) x 271 | + ($0.64 x 413) ] / 689 = $0.73.) Thus, I may reasonably assume from Dr. Bruno's report that he

not an average-to-average comparison that inappropriately strips away data-point distribution. To the contrary, this type of calculation is informative because it yields at least a rough estimate of where drivers often fell on the earnings-per-hour spectrum. The example from above is helpful in illustrating why this is so. Recall that, in the hypothetical scenario just discussed, the drivers at Affiliations A and B earned an average of $10.00 per hour. The average *variation* in fares earned per hour, irrespective of affiliation, was $3.00.[29] This $3.00 figure is much closer to the actual variations in fares earned per hour, which ranged from $2.00 to $4.00 per hour. This calculated average is therefore a much better representation of data distribution and, consequently, variability in earnings, than are the affiliation-specific calculations addressed previously.

The following of Dr. Bruno's results are therefore admissible under Rule 702: (1) that among the 689 drivers whose data were analyzed, drivers earned on average $16.95 in fares per hour; (2) that the fares actually earned (per hour) by those drivers were, on average, within 34 cents of $16.95; (3) that those same drivers earned an average of $19.26 in charges per hour; and (4) that the charges actually earned (per hour) were, on average, within 34 cents of $19.26. *See* Figure 2 of Bruno Report, [121-12] at 25 (fourth row). These calculations reasonably support

---

calculated the average variation in fare (or charge) per hour for all drivers by: (1) finding the difference for each of the 689 drivers between what they actually earned per hour and the average earned per hour for all drivers ($16.95 in fares, $19.26 in charges); (2) adding together each of those differences (for fares, then for charges); and (3) dividing each of those totals by the number of total records analyzed (689).

[29] [ |$6.00 − $10.00| + |$8.00 − $10.00| + |$12.00 − $10.00| + |$14.00 − $10.00| ] / 4 = [ $4.00 + $2.00 + $2.00 + $4.00] / 4 = $3.00.

Dr. Bruno's conclusion that variability in earnings among taxicab drivers was small, at least as compared to what those drivers earned (per hour) on average. *See id.*[30]

Thus, although the data used by Dr. Bruno did not account for all tips earned by the participating drivers, or take into account breaks taken by those drivers (*e.g.*, time spent away from the cab during a given lease), part of his conclusion is admissible, and at this stage, the record permits an inference in plaintiff's favor that there is in fact minimal variability among taxi drivers' incomes. Minimal variability, in turn, tends to show that there is little a driver can do to change her income through managerial skill.

But an inability to increase profits through skill does not alone establish that the second *Lauritzen* factor weighs in plaintiff's favor. This factor suggests that Callahan is economically dependent on the City only if a connection is shown between the inability to increase profits on the one hand, and the City's own conduct (*i.e.*, its rules and regulations) on the other. Dr. Bruno's report makes no such connection. In the end, then, for all the superficial appeal of data suggesting lack of variation, Dr. Bruno sheds almost no light on the question at hand. It is

---

[30] The parties also dispute the admissibility of another of Dr. Bruno's conclusions—that taxicab drivers on average earn less than the minimum wage once expenses are also taken in to account, *see* Figure 3 of Bruno Report, [121-12] at 25. In calculating these wage figures, Dr. Bruno used only a single number to represent what taxicab drivers on average spent on expenses, obtained from a different study conducted during a different time period. *See id.* Dr. Bruno did not separately measure or analyze the extent to which drivers may decrease their expenses (or not) based on managerial skill. This section of Dr. Bruno's report therefore adds no information to that already provided in his conclusions concerning income variability. Consequently, I do not address it here.

undisputed that at least some opportunities to increase profits through skill do exist—and there is no evidence suggesting that the drivers whose records were analyzed by Dr. Bruno attempted to take advantage of any such opportunities (or if so, to what extent).[31]  On balance, this factor weighs in favor of the City; cabdrivers have an ability to influence their profits or losses through skill that is independent of the City's regulations.

Also supporting the City's position is the final *Lauritzen* factor—the extent to which the service provided is "an integral part of the alleged employer's business." 835 F.2d at 1535. This factor necessarily cuts in favor of the City because, as discussed previously, the service that Callahan provides is transportation by taxicab, and that is not the City's business. Callahan's services may be integral to *someone's* business (perhaps her own, as a self-employed cabdriver), but that business is not the City's.

c.      The "Economic Reality" of Callahan's Work

While some *Lauritzen* factors suggest that Callahan is an employee of the City under the FLSA, others suggest that she is not. Ultimately, however, these criteria are merely aids or tools in gauging the economic reality of the situation. *See* 835 F.2d at 1538 (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976)). Employees (for FLSA purposes) are those who, "as a matter of economic

---

[31] Dr. Bruno's study did not measure what the participating taxicab drivers were actually doing in relation to their driving. The study considered only the "time in the car." *See* [148] at 16 ¶ 33.

reality[,] are dependent upon the business to which they render service." *Id.* at 1534 (quoting *Mednick*, 508 F.2d at 299).

Callahan argues that the City must be her employer since, according to Callahan, the City "prescribes her compensation." *See* [120] at 16. To establish that the City does this, Callahan turns to an Illinois statute providing that municipalities "may license, tax, and regulate . . . cabmen . . . and may prescribe their compensation." *See id.* at 18–19 (quoting 65 ILCS 5/11-42-6). This provision was at issue in *Campbell v. City of Chicago*, 823 F.2d 1182 (7th Cir. 1987).

In *Campbell*, a group of Chicago taxicab drivers brought a class action against the City under the Sherman Act, alleging that the City's ordinance concerning the manner in which individuals could acquire and retain taxicab licenses created a barrier to entering the taxicab market, and thus violated federal antitrust laws. *See* 823 F.2d at 1183. To establish its immunity from liability, the City argued that it fell within a narrow exception to the Sherman Act as articulated in *Parker v. Brown*, 317 U.S. 341 (1943). *See id.* at 1183–84. This exception exempted municipalities from liability under the Act if their conduct had been authorized by the state legislature, and if anticompetitive effects were a foreseeable result of that authorization. *See id.* at 1184. In *Campbell*, the City argued—and the court of appeals agreed—that Illinois had authorized the City to regulate the number of taxicab licenses (and the conditions under which such licenses are issued) because the State had granted the City the power to "prescribe [the] compensation" of cab drivers under 65 ILCS 5/11-42-6. *See* 823 F.2d at 1183–85.

The court noted that in granting the City the power to prescribe drivers' compensation, the Illinois General Assembly "must have foreseen regulations concerning the number of licenses" in the City, since, "if the City could . . . regulate the number of cabs, then it could be assured that with the fares it set, and the number of cabs it permitted, all drivers could make a profit." *Id.* at 1185.

The City contends in the present litigation that while it *may* prescribe taxi drivers' compensation under the statute discussed in *Campbell*, the City need not (and does not) do so in fact. *See* [144] at 28–29 (stating that the City "does not determine Callahan's profits and does not pay [her]"). Callahan takes issue with what she characterizes as the City's about-face from its previous position in *Campbell*. *See* [147] at 13. To the extent Callahan asserts a judicial-estoppel argument, however, that argument has been waived.[32] Moreover, that the City enjoys an antitrust exemption because of its state-awarded statutory power over the taxicab industry does not mean that the City has become Callahan's employer under the FLSA.

The City does not prescribe Callahan's compensation in the traditional sense; it does not, in other words, dictate the precise amount of money that Callahan will make each time she drives a taxicab for hire. Callahan does not dispute this, but argues that the City prescribes her compensation in effect by: limiting what she

---

[32] Callahan suggests that the City should be judicially estopped (from arguing that it does not prescribe taxicab drivers' compensation) for the first time in her reply brief. *See* [147] at 13. Arguments raised for the first time in a reply brief are waived. *See Padula v. Leimbach*, 656 F.3d 595, 605 (7th Cir. 2011) (citing *United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008)). Indeed, Callahan merely alluded to judicial estoppel in her reply; it was not until oral argument that Callahan affirmatively made the estoppel argument. That was too late.

may charge her passengers as metered fares; requiring that she pay certain taxes and fees; setting the maximum lease rates that medallion owners may charge lessee-drivers to use their licensed cabs; and limiting the overall supply of taxicab drivers by controlling the number of public chauffeur's licenses it issues. *See* [120] at 20.

Setting fare rates and controlling the number of licensed cabs is indeed regulating the compensation of cab drivers within the meaning of *Campbell. See* 823 F.2d at 1185. And, by regulating in this way, it may be that the City limits what taxicab drivers can take home in profits. Taxicab drivers may thus be economically dependent on the City, as plaintiff urges. *See* [120] at 20. But the critical question is not whether these drivers are "economically dependent" on the City, period. Every regulated industry is in a sense economically dependent on its regulator. The question that must be answered is whether taxicab drivers are economically dependent on the City's business. *See Lauritzen*, 835 F.2d at 1538 ("[T]he final and determinative question [is] whether . . . the personnel are so dependent upon the *business* with which they are connected that they come within the protection of the FLSA." (quoting *Pilgrim Equipment*, 527 F.2d at 1311–12)) (emphasis added).

The City has a great deal of power over the taxicab industry, and it exercises that power through regulation. But the City's regulation did not assume the business of providing private cars for hire. The reality of the situation presented here is that Callahan must do certain things (or avoid doing certain things) as a condition of using the City's streets to conduct a business. The evidence, even when

viewed in the light most favorable to Callahan, indicates that that business is hers, not the City's. Callahan is not economically dependent on the City's business, and so is not, as a matter of law, the City's employee for purposes of the FLSA. Because the City did not "employ" Callahan within the meaning of the FLSA, it does not owe her minimum wages as set forth in that Act.

The City's motion for summary judgment on Count V of plaintiff's amended complaint is therefore granted. Callahan's cross-motion on the same claim is therefore denied.

### B.    Illinois Minimum Wage Law (Count IV)

In her amended complaint, Callahan also asserts a claim against the City under the Illinois Minimum Wage law, 820 ILCS 105/1 *et seq. See* [33] at 12–13. Like the FLSA, the IMWL requires that employers pay their employees a minimum amount per hour—as of July 2010, $8.25 per hour. *See* 820 ILCS 105/4(a)(1). The Illinois statute also uses similar definitions—and, consequently, similarly circular definitions—of "employer" and "employee" as are found in the FLSA. *See id.* 105/3(c) (defining "employer" as "any individual [or] governmental . . . body . . . acting directly or indirectly in the interest of an employer in relation to an employee"); *id.* 105/3(d) (defining "employee" as "any individual permitted to work by an employer in an occupation"). The Illinois Administrative Code further underscores the comparability of the state and federal labor statutes, clarifying that "employee" under the IMWL, just as under the FLSA, means "any individual *permitted or suffered to work* by an employer," ILL. ADMIN. CODE tit. 56, § 210.110. And to

determine whether an individual has been permitted or suffered to work within the meaning of the IMWL, the Code states that an analysis resembling the *Lauritzen* "economic reality" test should be employed. *See id.* (describing six factors to be considered, including: (1) degree of control by the alleged employer; (2) the opportunity for profit and loss; (3) the extent of the relative investments; (4) the skill required; (5) the permanency of the relationship; and (6) the extent to which the services rendered are an integral part of the alleged employer's business).

Because the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both. *Cf., e.g., Condo v. Sysco Corp.*, 1 F.3d 599, 601 n. 3 (7th Cir. 1993) (discussing overtime-pay provisions); *Haynes v. Tru-Green Corp.*, 154 Ill.App.3d 967, 976 (1987) (same). The Illinois Administrative Code, too, states that for guidance in interpreting the IMWL, federal regulations (for the FLSA) may be used. *See* ILL. ADMIN. CODE tit. 56, § 210.120. Thus, for the same reasons that Callahan's FLSA claim fails, her IMWL claim also fails.

The City's motion for summary judgment on Count IV of plaintiff's amended complaint is granted. Callahan's cross-motion on Count IV is denied.

## C. Proof of Callahan's Damages

Defendant also moves for summary judgment on alternative grounds—*i.e.*, that even if the City of Chicago is Callahan's employer within the meaning of the FLSA (and thus the IMWL), Callahan's claims still fail because a jury could not reasonably conclude that she did not earn the minimum wage, under either statute,

during the relevant time period (January 2009 through August 2011). *See* [93] at 29–31.

Relying on *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), Callahan asserts that, to prove that she earned less than the applicable minimum wage, she need only provide enough evidence "to support a 'just and reasonable inference' that she performed work for which she did not receive" proper payment. [120] at 34 (quoting *Anderson*, 328 U.S. at 687–88). *Anderson*'s burden-shifting standard applies when an employer is on notice that it is subject to the FLSA's record-keeping requirements, and, more importantly, after a plaintiff has established liability. Neither circumstance is present here, and *Anderson*'s exception to the default burden of proof therefore does not apply.

In *Anderson*, the employer had not kept adequate wage and hour records as required by Section 11(c) of the FLSA[33], and the Court declined to penalize the plaintiffs for their employer's shortcoming. "[W]here the employer's records are inaccurate or inadequate," the Court opined, an employee has carried out her burden if she proves: (1) that she "has in fact performed work for which [she] was improperly compensated"; and (2) if [she] produces sufficient evidence to show the

---

[33] Section 11(c) of the Act requires that employers "make, keep, and preserve such records of the persons employed . . . and of the wages, hours, and other conditions and practices of employment." 29 U.S.C. § 211(c).

amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687.[34]

But as the City points out, *Anderson* addressed a situation in which it was quite clear that the defendant was the plaintiffs' employer. The opposite is true here. Whether the City is Callahan's employer is not merely a passing inquiry; it is the central focus of the parties' motions for summary judgment. Callahan asserts that whether the City considered itself to be Callahan's employer is irrelevant, since employers are not entitled to enjoy the fruits of having misclassified their employees as independent contractors. *See* [120] at 35. But this case is not one of simple misclassification as described in *Lauritzen*. As explained above, the distinction here is not between "employee" and "independent contractor." While one might plausibly argue that business owners or operators who "misclassify" their employees as contractors at least know that they have hired workers—and, therefore, have sufficient notice that, as the hiring party, they might as a matter of law be on the hook to keep proper records under Section 11(c) of the FLSA—the same is not true of the City. The City did not have adequate notice that it might be held to the record-keeping requirements of the FLSA because it one day might be found to "employ" the cabdrivers it licenses.

---

[34] Once the employee has produced enough evidence to show the amount of uncompensated work as a matter of just and reasonable inference, the burden then shifts to the employer "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88.

Moreover, the just-and-reasonable-inference standard was conceived to permit workers to recover damages under the FLSA (even where the worker himself had not kept detailed records of how much overtime he had worked) where two criteria were satisfied: first, that the employer had not kept such records (or had done so poorly), *see* 328 U.S. at 687, as just discussed; but second—and more importantly here—that the worker had already proven a violation of the FLSA in the first instance, *see id.* at 688. The employee, in other words, must have already shown that she had "performed work [but had] not been paid in accordance with the statute," *id.* In articulating the just-and-reasonable-inference standard, the Court was quite careful to explain that this relaxed standard was appropriate only *because* the FLSA violation itself had already been established. Otherwise, said the Court, such a standard would run afoul of the rule "that precludes the recovery of uncertain and speculative damages." *Id.* The existence of damages is certain where the underlying violation has already been demonstrated, and all that is left is to determine is the extent or amount of that damage. *See id.* Here, however, the two issues are intertwined: Callahan endeavors to prove that a violation occurred in the first instance—*i.e.*, that she was not paid the minimum wage during a certain time period—by demonstrating the extent to which she was underpaid. Adjusting Callahan's burden of proof would not be permissible here in the same way that it was acceptable in *Anderson*.

In any event, it would not be just and reasonable to infer from the meager evidence Callahan musters that she was paid less than the applicable minimum

wage. The evidence on which Callahan relies includes: (1) Callahan's sworn declaration concerning what she earned when working as a full-time taxicab driver[35]; (2) her recently amended federal tax returns for those years; (3) lease and business records that show "times worked and income earned"; (4) credit-card payment reports; and (5) three third-party studies concluding that taxicab drivers generally do not earn either the federal- or state-required minimum wage. *See* [120] at 33–34.

### 1. *Evidence Concerning Income Earned*

To establish the amounts she earned as a cab driver from January 2009 through August 2011, Callahan first turns to her own declaration, in which she explains how she estimated her earnings during that time period. Callahan says that she was unable to save money during that time, so she assumed that her income from taxicab driving—or "actual pay," as she calls it—was at most equal to her total expenses for each of the three years in question. *See* [121-26] at 4 ¶ 20. Callahan maintains that she had two types of expenses: personal or "household" expenses (such as rent, utilities, cell-phone bills, and the like), and taxi-related expenses (such as the cost of gas and taxicab leases). *See id.* She had kept some of her (unidentified) personal bills, and she looked at those in order to estimate her

---

[35] Callahan also purports to rely on her deposition testimony. *See* [120] at 33. However, she neglects to identify which portions of her deposition she maintains are relevant. In her declaration, [121-26], she states that she reviewed certain pages of her deposition transcript in preparing to execute the declaration, and that she believes that the declaration is consistent with that deposition testimony, *see id.* at 2 ¶ 7. I therefore assume that the deposition testimony to which Callahan refers in her summary-judgment brief concerns the same information as addressed in her declaration.

household expenses. *See id*. She estimated her taxicab-related expenses based on her personal knowledge and experience as a taxi driver. *See id*. The results Callahan obtained for her "actual pay" are presented in a spreadsheet attached as Exhibit F to her declaration. *See id*. at 16–20.

Sworn declarations or affidavits may be used in support of a party's motion for summary judgment (or in opposition to such a motion), but the statements therein must meet certain requirements: they must be made on personal knowledge, and set out facts that would be admissible in evidence, *see* Fed. R. Civ. P. 56(c)(4). Callahan's declaration—at least insofar as the declaration pertains to her earnings during the relevant time frame (as summarized in Exhibit F thereto)— does not meet this standard.

Callahan states in her declaration that, to her recollection, she earned only as much money as she spent in 2009, 2010, and 2011. The amount of money that Callahan spent in relation to how much she earned is a fact within her personal knowledge, and thus a fact to which she may properly testify. But to arrive at *how much* she spent (and, thus, how much she earned), Callahan states that she "reverse engineered" that figure by looking at how much she spent on household expenses, and by estimating her taxicab-related expenses. *See* [121-26] at 4 ¶ 20. These statements are more problematic.

Callahan first maintains that she determined her personal expenditures by looking at her household expenses such as rent, utilities, cell phone bills, and credit-card bills, and then "total[ing] what [she] would have spent." *Id*. She also states in

her declaration that she has "many of the[] receipts" on which she relied, as well as bank statements. *Id.* Though she may have kept such records, she included none in the summary-judgment record. Their contents are a mystery. Moreover, Callahan testified at her deposition that while she had kept some personal household bills, she had not kept all of them. *See* [122] at 17 ¶ 54; November 18, 2013 Deposition of Melissa Jean Callahan, [92-1] at 12–13. Thus, to determine the missing amounts, she simply made rough estimates by extrapolating from whatever numbers she did have. *See id.* Callahan also estimated her taxicab-related expenses (gas and lease agreements), but those estimates were not based on any records at all; they were based merely on Callahan's purported "personal knowledge and experience as a taxi driver," [121-26] at 4 ¶ 20.

These statements are insufficient to establish that Callahan has adequate personal knowledge of her actual expenses (and thus actual earnings) in 2009, 2010, and 2011. She has provided only conclusory assertions of what she believes she may have spent, but no information from which to infer that those beliefs are reasonable or justifiable. For example, Callahan offers no information regarding the personal bills she claims she did keep and rely on (how many she kept, what time period they were from, or why those bills are representative), or any explanation of why her estimations based on those bills are plausible. Callahan may testify to what she knows or recalls, but she must first lay an adequate foundation for that knowledge or recollection. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal

knowledge of the matter."). Absent such a foundation, Callahan offers only speculation as to what she actually earned. And mere speculation is not enough to satisfy the personal-knowledge requirement for affidavits. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 912 (7th Cir. 2002) ("[A] party to a lawsuit cannot ward off summary judgment with an affidavit . . . based on . . . conjecture." (quoting *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989))); *cf. Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) (classifying statements as "merely conjecture" because they lacked particularity as to what the affiants actually knew). Consequently, Callahan's assertions concerning what she earned as "actual pay" in 2009, 2010, and 2011—as presented in the summary spreadsheet attached to her declaration, *see* Exhibit F to Callahan Declaration, [121-26] at 16–20—are inadmissible.[36]

To corroborate Callahan's estimation or reconstruction of what she (allegedly) earned in 2009, 2010, and 2011, Callahan relies on her federal tax returns for those years. *See* [120] at 34 (citing Plaintiff's Local Rule 56.1(b)(3) Statement, [122] at 23

---

[36] Callahan argues that the statements in her declaration are adequate to establish her "actual pay" because the just-and-reasonable-inference standard permits her to reconstruct such numbers from memory. *See* [120] at 33 n. 5 (citing *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013)). In *Espenschied*, the Seventh Circuit did observe that reconstruction by memory *may* "enable[] the trier of fact to draw a just and reasonable inference" of underpayment, 705 F.3d at 775 (internal quotation marks omitted)—at least as far as unreported work time is concerned, *see id.* As discussed above, however, I am not convinced that the same principles apply to situations such as this one, where the amount of uncompensated work is being used to prove the underlying violation. In any event, even assuming that Callahan may properly reconstruct her expenses (and thus earnings) by memory in order to demonstrate a minimum-wage violation, Callahan has pointed to no authority suggesting that she may offer such memories without first laying a foundation as to their basis. The personal-knowledge requirement applies to statements of memory just as it does to other forms of testimony, and Callahan has not satisfied that requirement here.

¶ 9). Callahan in fact submitted two tax returns for each of these three years—one original, and one amended, *see* [95] at 14 ¶ 59. It is to the amended returns that she now turns for support. But this evidence, too, fails to aid Callahan in carrying her burden of proof. The firm that prepared Callahan's amended returns did not rely on any documents concerning her income, since Callahan did not provide any. *See* [95] at 14–16, ¶¶ 60, 62, 64; [122] at 18–19, ¶¶ 60, 62, 64. Rather, it was Callahan herself who calculated the figures reported in the returns, and she performed those calculations using the same approach that she used to estimate her "actual pay": she "reconstructed" her earnings by reverse-engineering them from her estimated total expenditures during those years, *see id.*; [141] at 5 ¶ 9. The statements in Callahan's amended tax returns therefore suffer from the same foundational defects as do her earlier-described statements concerning her "actual pay." The former, consequently, cannot corroborate the latter.

Callahan also relies on what she refers to as "business records showing . . . income earned." [120] at 34 (citing [122] at 22 ¶ 4). Callahan claims that these records consist of notes that she took regarding her lease- and gas-related expenses, as well as her income from taxicab driving, in seven months from 2009 (February, May, June, July, August, November, and December) and in two months from 2010 (January and February). *See* [122] at 22 ¶ 4 (citing Exhibit A to Callahan Declaration, [121-26] at 6–9). These records are hearsay: they are statements made outside of proceedings for this litigation, offered to establish the truth of the matter asserted—Callahan's earnings as a taxicab driver in certain years. *See* Fed. R. Evid.

801(c). Callahan attempts to overcome this problem by referring to the notes as "business records" made contemporaneously with the events described therein (dollars earned and spent). *See* Callahan Declaration, [121-26] at 2 ¶ 8 (stating that she kept the records "in the course of driving a taxi . . . in 2009 and 2010"); *see also* Plaintiff's Local Rule 56.1(b)(3) Statement, [122] at 22 ¶ 4 (describing "contemporaneous notes"). If Callahan did indeed keep these records as a matter of regular practice while driving a taxicab for hire—and if she did indeed create the records at or near in time to the events she describes in those records—the "business record" exception to the hearsay rule could apply. *See* Fed. R. Evid. 803(6).

But there is no suggestion that Callahan kept these records as a matter of regular business practice. To the contrary, she kept the notes for only 9 months out of a collective 24 in 2009 and 2010, and admits in her declaration that while she "intended to keep those records more consistently, [she] did not," [121-26] at 2 ¶ 8. Moreover, Callahan's description in her declaration (executed in May 2014) of the notes as contemporaneous, *see id.*, is contradicted by her earlier deposition testimony, in which she stated that she created the notes not while she was driving a taxicab in 2009 and 2010, but *after* she filed her lawsuit against the city (*i.e.*, after January 18, 2012, *see* [1]). *See* Callahan Deposition, [143-11] at 4.[37] Consequently,

---

[37] At her deposition, Callahan was asked when she created the notes. Although she did not recall the exact date, she did remember that she had created them after filing the present suit:

Q: When did you create [the handwritten notes]?

Callahan cannot use the notes to defeat the City's motion for summary judgment. *See Harmon v. Gordon*, 712 F.3d 1044, 1051–52 (7th Cir. 2013) ("[T]he law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition . . . testimony." (quoting *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996))).[38]

Finally, Callahan relies on credit-card payment reports to establish what she earned as a taxicab driver during the relevant period. She asserts that these reports were obtained from a taxicab affiliation. *See* [120] at 34. Even supposing that the payment reports are admissible as evidence, they are of little help to Callahan here. First, the reports are presented in a format that renders much of the data indecipherable. The data appear in a spreadsheet, without column headings, such that it remains unclear what many of the columns actually represent. *See* [121-25]. Some of the columns are truncated so that many of the numbers in those columns are cut off or invisible. *See id.* The only entries whose meaning is clear are dates

---

A: I don't recall.

Q: More or less than a year ago?

A: I don't recall the exact date.

Q: Well, how about before or after you first filed this lawsuit?

A: After.

[143-11] at 4.

[38] Even if Callahan's notes were admissible as evidence, that evidence still would not be enough to draw a just and reasonable inference that Callahan did not earn the minimum wage, as explained below in Part III.C.2 of this opinion.

(*e.g.*, "11/27/2011") and method of payment (*e.g.*, "Visa"). But these entries do not establish what Callahan earned as a taxicab driver.

It is possible that the entries in another of the columns (the ninth from the left), whose data are also visible, represents what Callahan earned by credit card on those dates. But these data, too, are unhelpful to Callahan. They include only the payments that Callahan allegedly received by credit card. Callahan provides no evidence that, during the years relevant to this inquiry, she was paid *only* by credit card and never with cash. And if she was paid with at least some cash, then the data presented here are incomplete at best. Even more problematic, though, is that these entries do not appear to overlap with the relevant time period at all. Callahan's minimum-wage claims are limited to the period beginning in January 2009 and ending August 2011. *See* [122] at 1 ¶ 1. The credit-card payments listed here are from November 2011 to February 2012. *See* [121-25].

In short, Callahan has failed to present admissible evidence that her profits from driving a taxicab from January 2009 to August 2011 were indeed what she now claims they were, and she has no foundation other than speculation to estimate her earnings from memory. Callahan has therefore failed to present sufficient proof from which I may draw a just and reasonable inference that, during this time period, she did not earn at least the minimum wage under either the FLSA or the IMWL. But even accepting as true Callahan's statements concerning her "actual pay" in 2009, 2010, and 2011—or, alternatively, accepting as true any other statements concerning what Callahan earned as income from taxi driving during

that time frame—I am still unable to draw a just and reasonable inference that Callahan did not earn the minimum wage, because she has not presented sufficient evidence of how many hours she actually worked as a taxicab driver within the meaning of those statutes.

### 2. Evidence Concerning Hours Worked

Between January 2009 and August 2011, Callahan did not keep any records of the number of hours she drove a taxicab for hire. *See* [122] at 21 ¶ 73. Nor did she keep a calendar or schedule of her driving. *See id.* She did, however, retain copies of nearly all of the taxicab lease agreements she entered in 2010 and 2011, *see* [141] at 3 ¶ 5, which she also attached to her declaration, *see* Exhibit G to Callahan Declaration, [121-26] at 21–93. Taxicab leases typically are executed in increments of 12 or 24 hours, and Callahan states in her declaration that it was her practice to work all hours of a given lease, *see id.* at 2 ¶¶ 10–11; *see also* [141] at 3 ¶ 5. Even when she took a break to use the washroom or eat a meal, Callahan considers that she was working during that time. *See* [121-26] at 2 ¶ 11. Similarly, if Callahan took a nap while waiting in her taxicab in a line at the airport, she counted that time as work time. *See id.* Callahan summarizes the number of hours she claims to have worked in 2009, 2010, and 2011, respectively, in the spreadsheet attached as Exhibit F to her declaration. *See id.* at 16–20.

There are two problems with Callahan's summary of how many hours she claims to have worked. First, even assuming that the lease-agreement records on which Callahan purports to rely are admissible in evidence, those records do not

adequately support the statements appearing in Callahan's summary spreadsheet (Exhibit F) as to the number of hours Callahan worked per lease.

In general, the lease agreements provided by Callahan are form agreements that include lease rates for 12-hour, 24-hour, and weekly leases, respectively. *See, e.g.*, [121-26] at 23. There is also a section of the agreements entitled "TYPE OF LEASE," which includes the following options:

| | |
|---|---|
| 12 HR(DAY) | 5 AM to 5 PM |
| 12 HR(NIGHT) | 5 PM to 5 AM (Next Morning) |
| 24 HR(SINGLE) | 5 AM to 5 AM (Next Morning) |
| WEEKLY | 5 AM Monday to 5 AM Next Monday |

*See, e.g., id.*[39] On many of the lease agreements provided by Callahan, one of these options has been circled by hand or otherwise marked in some way. *See, e.g., id.* at 31–32. I infer from these markings that, for a given lease agreement, Callahan agreed to lease a taxicab for the number of hours indicated. But while many of the lease-agreement records include some kind of indication as to which type of lease was selected, not all of them do. For example, Callahan purportedly entered into a lease agreement for March 2, 2010 to March 3, 2010, but none of the lease-type options is selected in this agreement. *See id.* at 23. It is therefore unclear from this record, at least on its face, which type of lease Callahan actually entered for those dates. The dates themselves provide some clues: it is clear in this particular instance that Callahan did not enter a 12-hour daytime lease, for example, since the

---

[39] A second type of form agreement has only three options: "12 HOURS (DAY)," "12 HOURS (NIGHT)," and "24 HOURS." *See, e.g.*, [121-26] at 43. For these agreements, the type of lease selected is typically indicated with a typewritten "x" next to the chosen option. *See, e.g., id.* The lease rate is provided only for the type of lease chosen. *See, e.g., id.* ($93.00 for 24 hours).

start and end dates would have been the same (*e.g.*, March 2, 2010 to March 2, 2010). But it is equally plausible that Callahan entered a 12-hour *nighttime* lease as that she entered a 24-hour lease—both of which would span from one day to the next—for the dates listed. In the spreadsheet attached to her declaration, however, Callahan claims (without explanation) that this lease was a 24-hour lease. *See id.* at 17. She offers no evidence suggesting that she did anything more than assume that the higher number was the correct one. The lease rates transcribed on the agreement form provide no guidance, either, since all possible rates (for 12-hour, 24-hour, and weekly leases) appear in the agreement form and none is marked or highlighted in any way. *See id.* at 23.

Thus, at least some of the hours listed in Callahan's summary spreadsheet— and thus the number of hours she claims to have worked—are questionable. But I need not determine the extent to which Callahan has (or has not) laid an adequate foundation for her work hours, because even assuming that all of Callahan's lease hours were tabulated correctly, they do not establish a minimum-wage violation using even the "just and reasonable inference" burden of proof. The lease hours that Callahan reports are insufficient to carry her burden because Callahan has not provided evidence reasonably suggesting that she actually worked those hours within the meaning of the FLSA (or, consequently, the IMWL).

Callahan claims that she worked every minute of every lease she entered during the relevant time period. *See* [121-26] at 2 ¶¶ 10–11. This was true, she says, no matter the length of the lease. She worked every minute of every 12-hour and 24-

72

hour lease, and the story was no different for leases of longer duration (such as 72 or 96 hours). *See id.*; [122] at 20 ¶ 70. However implausible her testimony on this point (especially when it concerns leases exceeding 24 hours), how much time Callahan spent driving a taxicab is a fact within her personal knowledge, and thus a fact that I must accept as true when viewing such facts in plaintiff's favor. What I cannot take at Callahan's word, however, is her definition of "work" in the first place. Whether certain activities constitute work under the FLSA is a matter of law, not of fact.

Callahan claims that she was "working" as a taxicab driver not only when she was driving a cab for hire, but also when she was eating, using the restroom, or napping while in line at Chicago-area airports. *See* [121-26] at 2 ¶ 11. The City argues that sleeping is not working, and that Callahan's statements as to hours "worked" are therefore unreliable. *See* [93] at 30–31. Napping in a taxicab while waiting for passengers—or taking a quick break to grab a meal or use the washroom—can be "working" under the FLSA. The FLSA requires "no exertion at all." *Sehie*, 432 F.3d at 751 (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)). Even hours "spent in idleness" may be hours worked within the meaning of the FLSA. *Id.* (citing *Armour*, 323 U.S. at 133). Napping, in short, is not necessarily off the table.

Nevertheless, not all hours worked in furtherance of one's job or occupation are necessarily hours "worked" under the FLSA. Those that count are the hours "that the employee is required to give his employer." *Id.* (citing *Armour*, 323 U.S. at

133); *see also* 29 C.F.R. § 785.7 ("The workweek ordinarily includes 'all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place.'" (quoting *Anderson*, 328 U.S. 680)). Work hours that are not explicitly required or requested may also count, but they must at least be hours that the employer knows about (or has reason to know about), and thus hours that the employer implicitly accepts as work time. *See* 29 C.F.R. § 785.11 (stating that time is "working time" when the employer "knows or has reason to believe that [the employee] is continuing to work") (citations omitted); *see also Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) ("[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about.") (citations omitted). Here, Callahan provides evidence purporting to show only how much she worked as a taxicab driver—not the extent to which the City (or any other potential employer under the FLSA) actually required her to perform that work, or even knew (or should have known) that she did.[40] If Callahan's work was not completed at an employer's command, or at least with an employer's implicit acceptance, it was not "work" within the meaning of the FLSA or, consequently, the IMWL.

---

[40] The FLSA does not relieve employers of their duty "to inquire into the conditions prevailing in [their] business [simply] because the extent of the business may preclude . . . personal supervision." *Kellar*, 664 F.3d at 178 (citation omitted). But even assuming that the City's business was providing taxicab services, the generally prevailing condition of that business was that public chauffeurs such as Callahan were not obligated to use their licenses at all. Thus, the City had no reason to suspect (and Callahan points to none) that Callahan was using her license to drive taxicabs for hire, or how much she was doing so.

Thus, even accepting as true Callahan's representations as to how much she earned as a taxicab driver from January 2009 through August 2011—and also accepting as true that during that time she worked (in the literal sense) as many hours as she now says she did—I cannot draw from that evidence a just and reasonable inference that Callahan "worked" within the meaning of the FLSA or IMWL any hours for which she was not paid at least the minimum wage. As a matter of law, Callahan has therefore failed to establish a minimum-wage violation under either statute.

Callahan falls back on evidence unrelated to her own driving, relying on three studies concerning taxicab-driver wages overall. *See* [120] at 34.[41] These studies, says Callahan, show that "many drivers earn less than $7.25 an hour." [141] at 7 ¶ 11. But these studies cannot save Callahan's claims. Whether drivers other than Callahan earn or have earned the minimum wage (under either the FLSA or IMWL) is irrelevant to whether Callahan herself earned that minimum. It is the latter that Callahan must prove at this stage of the litigation, and she has not done so.

Thus, even if the City is presumed to be Callahan's employer within the meaning of the FLSA and IMWL, the City's motion for summary judgment is granted—and Callahan's cross-motion denied—because Callahan has not provided

---

[41] The three studies are a 2009 wage study conducted by Dr. Bruno, a similar wage study conducted by David Champion, and the study performed by Dr. Bruno in connection with his expert report, as discussed above. *See* [141] at 7 ¶ 11.

evidence from which to draw an inference that she was not paid the minimum wage as set forth in those statutes.

## IV. Conclusion

Callahan was a full-time taxicab driver from January 2009 through August 2011. During that time, she purportedly earned only enough money to cover her personal and occupational expenses—an amount that Callahan says failed to meet both state and federal wage minimums. While it is unfortunate that Callahan did not earn from taxicab driving as much money as she would have liked, the City of Chicago is not obligated to make up the difference. The City is not her employer under either statute; and even if it were, Callahan was unable to muster admissible evidence to suggest that she is owed any wages. For the reasons discussed above, defendant's motion for summary judgment on Counts IV and V of the amended complaint, [90], is granted; Callahan's cross-motion on the same counts, [119], is denied. Callahan's motion for class certification [65] is denied as moot. The Clerk shall enter judgment in favor of the defendant.


ENTER:

Manish S. Shah
United States District Judge

Date: 1/23/15